[Civ. No. 13902.   First Dist., Div. One.   May 11, 1949.]

HARRY B. ELMERS et al., Appellants, v. HARRY
SHAPIRO et al., Respondents.

Arthur T. Bridgett for Appellants.

Cosgriff, Carr, McClellan & Ingersoll and Kirkbride, Wilson, Sutton, Harzfeld & Wallace for Respondents.

PETERS, P. J.—Plaintiffs, Harry B. Elmers and his mother Margaret Elmers, purchased a duplex dwelling located on Woodside Way, in San Mateo. This building had been constructed with priority materials secured under federal permits, and, pursuant to federal legislation, the proper federal agency had placed a ceiling price of $13,700 upon it. Plaintiffs purchased the duplex for $8,000 in cash and a five-room house owned by them on Laurel Avenue in Burlingame. This house was valued in the deal at $5,700, but, as an integral part of the transaction, was sold for $11,250. After the transaction was closed plaintiffs brought this action to recover a claimed overcharge, it being their theory that the price charged them for the duplex was in fact $19,250 ($8,000 cash, plus their house sold for $11,250), and that this sum far exceeded the ceiling price of $13,700. The principal defendants are Harry Shapiro, who is a contractor, the builder of the house in question, its former owner, and who actually received $19,250 for the duplex, less expenses, and John B. Cockroft the real estate broker who handled and worked out the somewhat complicated series of transactions, hereafter described, by which the deal was consummated. After a trial before the court without a jury, judgment was entered in favor of all the defendants. Plaintiffs appeal.

### Statement of Facts

Harry B. Elmers is an honorably discharged veteran of World War II, and, as such, was entitled to certain preferences and protections in the purchase of housing under the Veterans' Emergency Housing Act of 1946, a federal statute. He desired to sell or to trade the Laurel Avenue house, owned by him and his mother, for a duplex, in order to live in one unit and to secure an income from the other. The value of the Laurel Avenue house is one of the basic questions in dispute. In this transaction the Elmers were credited with $5,700

for this property. Just prior to the closing of the deal the Bank of America appraised the Laurel Avenue property as having a "trading value" of $9,250, and a "loan value" of $11,000. Cockroft appraised it at $9,000, while Shapiro valued it at $7,000. Elmers thought it was worth $12,000. Before Shapiro consented to the sale of the duplex, and as an integral part of the transaction, Cockroft arranged for a sale of the Laurel Avenue property to the Carrs for $11,250.

Harry Shapiro, a contractor, purchased a lot on Woodside Way in San Mateo upon which he desired to build a duplex. He drew plans for the building, and these, together with the proper documents, he submitted to the Federal Housing Authority, in order to secure priorities for certain building materials then unavailable without such priorities. The law required preferences to be given to veterans in the purchase of such properties and required the fixing of a ceiling price on such structures. Shapiro requested that the ceiling sales price be fixed at $17,000 and the rental value per unit be fixed at $80, the maximums provided by the law for a duplex. In August of 1946, the F.H.A. fixed a ceiling sales price of $13,700 and a rental ceiling of $70 per unit. This was communicated to Shapiro, who took no legal steps to challenge the order as permitted by the law, but did informally request the F.H.A. to adjust upward its order, but this request was refused. Shapiro started construction with full knowledge that the duplex lawfully could not be sold for more than $13,700. Sometime before October, 1946, and while the duplex was still under construction, Shapiro orally told Cockroft that he was building the duplex, and to "watch out for a trade," it being his belief that the F.H.A. was not interested in the value of properties traded for properties subject to a ceiling price. He testified, and the trial court found, that he was so informed, orally, by an employee of the F.H.A.

Early in October, 1946, Harry Elmers visited the real estate office operated by Cockroft to inquire about the availability for purchase of a duplex. Some of the conversations he then had were with Cockroft's son or other employees of the firm, but it is admitted that all such employees were acting in the course and scope of their employment with Cockroft and that he is legally responsible for their actions, so that all such conversations and dealings will be treated as if they were had with Cockroft personally. In this first conversation Elmers told Cockroft that, before he could purchase a duplex or other income property, he would have to dispose of his

Laurel Avenue house. Cockroft showed Elmers several pieces of property, including the duplex being constructed by Shapiro, in which Elmers immediately evidenced a lively interest. Cockroft told Elmers that the duplex could not be purchased directly, but could only be secured on a trade because the ceiling price was $13,700 and the duplex could not be constructed for less than $17,500. Elmers talked with Shapiro and discovered that Shapiro was only interested in a trade. Elmers then told Cockroft that he was interested and was willing to sell his home on Laurel Avenue in order to purchase the duplex. Cockroft had the Laurel Avenue property appraised, with the results already mentioned.

There was a major dispute over whether Cockroft or Shapiro ever told Elmers about the ceiling price. Both testified that they told him that the ceiling price was $13,700 and that Shapiro would not sell at that figure. Elmers denied this testimony. In addition, both defendants testified, as did others, that there was an F.H.A. placard on the property stating the ceiling price. Elmers testified that, although he visited this property frequently, he never saw this placard. He further testified that, although he knew such properties had to have a ceiling price, he made no inquiry as to the ceiling price on this property, and did not learn of it until February of 1947, after the deal had been closed and he had moved into the duplex. The trial court found that Elmers was informed of the ceiling price, and, in view of the conflict in the evidence, this finding must be upheld.

After some discussion of the problem, Cockroft suggested to Elmers that Elmers should make an offer for the duplex, and suggested that Elmers should offer to turn in the Laurel Avenue property, and, in addition, assume a $9,000 construction loan Shapiro had placed on the duplex. Elmers told Cockroft that this was too high a price, but several days later, on October 8, 1946, he signed a formal offer of exchange offering to buy the duplex for the Laurel Avenue property and $8,000, and authorizing Cockroft to handle the transaction. The agreement specifically provided that Elmers was to pay Cockroft a commission of $450 if the deal was consummated. This commission, computed at the normal 5 per cent, fixes the value of the Laurel Avenue property at $9,000.

When Cockroft submitted Elmers' offer to Shapiro the latter did not sign it, or otherwise accept it, but he told Cockroft that he had again approached the F.H.A. with a request to

raise the ceiling price but that the request had been denied. About a week later Shapiro told Cockroft that he would not accept the Laurel Avenue property in a direct trade; that he had originally intended to accept Elmers' offer and to give the Laurel Avenue property to his son and his wife, but that now they did not want it; that he would not sign the acceptance of the offer, but that he would orally agree not to sell or to trade the duplex to anyone else for two weeks, during which time Cockroft was to try to sell the Laurel Avenue property and cash it out.

Elmers testified that he knew that he had the legal right to withdraw his offer at any time before the deal was closed because Shapiro had not signed the acceptance. He also knew, because of a veteran's loan necessary for him to secure, that a government agency had to pass on the transaction and would appraise the duplex. Although he knew that a ceiling price had to be placed on the duplex, he made no inquiries as to the ceiling price or as to the amount of the appraisal made by the government.

On October 25, 1946, Cockroft secured from Raymond and Mary Carr a signed offer, accompanied by a $500 deposit, to buy the Laurel Avenue property for $11,250. That property was still in the names of Elmers and his mother, but Cockroft told the Carrs that he was representing Shapiro in the deal.

The transaction was completed by two escrows, one for the sale of the Laurel Avenue property, and the other for the sale of the duplex. In the instructions prepared by Cockroft and signed by Elmers the transaction was treated as an exchange of the Laurel Avenue property, plus $8,000 for the duplex, with $450 to be paid by Elmers to Cockroft as a commission.

The other escrow was more complex. The Elmers deeded the Laurel Avenue property to the Shapiros. They, in turn, deeded it to their son Leonard. The title company was instructed to deliver the deed to Leonard upon his payment to his father of $5,700. Thus, it was made to appear that Harry Shapiro only got $5,700 for the Laurel Avenue property, which, with the $8,000 in cash, is the exact amount of the ceiling price of the duplex. Leonard then deeded the Laurel Avenue property to the Carrs (his father actually signing the instructions) upon their payment of $11,250. Admittedly, Leonard did not pay $5,700 or any other sum for the Laurel Avenue property, and admittedly he did not receive one cent of the $11,250 received from the Carrs. Admittedly, the

$11,250, less expenses, was paid to and for the use of Harry Shapiro. Admittedly, Harry Shapiro paid income tax on the total profit realized from the transaction. Admittedly, neither Cockroft nor Shapiro ever told Elmers of the amount that was being realized on the sale of the Laurel Avenue property to the Carrs.

Thus, so far as the form of the transaction is concerned, Harry Shapiro received but $13,700 for the duplex, and a statement prepared by the title company in the Laurel Avenue escrow so declares. Actually, however, Shapiro received $19,250 for his duplex, less commissions and title company expenses. Actually, the transaction was not a trade at all, in the normal sense of those words. Elmers offered to trade, but that offer was never accepted. Shapiro refused to go ahead at all unless the Laurel Avenue property was sold and cashed out. So far as he is concerned, he wanted and got $19,250 for his duplex.

Cockroft, who maneuvered this series of transactions, received the following commissions:

From Elmers on the sale of Laurel Avenue......$450.00
From Shapiro on the sale of Laurel Avenue...... 562.50
From Shapiro on the sale of the duplex......... 237.50
    Total .................................$1,250.00

It is an admitted fact that the duplex in the hands of Elmers is still subject to the ceiling price of $13,700, and that he cannot lawfully sell it for more than that figure. Elmers admitted that he has never offered to rescind if Shapiro would give him $19,250, and he testified that he would not sell the duplex for that amount.

Shapiro testified that a Mr. McGregor, who was apparently a valuator in the F.H.A., told him that he could lawfully enter into a trade because the F.H.A. was only interested in what the records showed, and not interested in the actual value of the traded properties, and that he, Shapiro, proceeded with the transaction in reliance upon this representation. McGregor was not available as a witness during the trial proper, but before judgment was entered Elmers moved to reopen the case to take the testimony of McGregor. This motion was accompanied by McGregor's affidavit denying, in substance, the statements attributed to him by Shapiro. The trial court denied the motion.

It is also an admitted fact that under F.H.A. regulations all deeds conveying properties subject to ceiling prices were

required to contain a statement setting forth the selling price. Such a provision was not contained in the Shapiro-Elmers deed to the duplex.

## Findings of Fact

The trial court found that Elmers sought out the services of Cockroft for the purpose of securing his help in purchasing a duplex, and made a written offer to exchange his home on Laurel Avenue plus $8,000 for the duplex; that Elmers then knew "that there was an application for priority and a ceiling price of $13,700.00 on said duplex"; that Elmers, between October 8 and December 1, 1946, continuously and frequently importuned and requested Shapiro to accept his offer; that Shapiro told Elmers of the ceiling price, and told him that he could not enter into the transaction without the approval of the F.H.A.; that Shapiro consulted a representative of the F.H.A. and was told by him that the government was not interested in the value of property taken in a trade, or what such property might later be sold for; that the escrow records show that the duplex was sold for $13,700, and that the trade in value of Elmers' house was $5,700; that the cost and value of the duplex was in excess of $13,700; that its value at the time of the exchange was approximately $17,850 and was so appraised by the Veterans' Administration; that its value at the time of trial was $21,000; that the actual value of the Laurel Avenue property was approximately $8,000 less than the actual value of the duplex; that the commissions received by Cockroft were customary and reasonable. These findings are all supported by substantial evidence. The court also found that no fraud was practiced upon Elmers, and that Shapiro and Cockroft "have not violated any of the provisions of the Veterans' Emergency Housing Act of 1946, or any regulations thereunder."

## Pertinent Provisions of the Statute

The controlling statute is the Veterans' Emergency Housing Act of 1946, effective May 22, 1946. (60 Stats. 207; 50 U.S.C.A.App., § 1821 et seq.) Various sections of this act were repealed by the Housing and Rent Act of 1947, effective June 30, 1947 (61 Stats. 193; 50 U.S.C.A.App., § 1881), but were in effect at all times here pertinent.

Section 1(a) of the 1946 act states that the statute is aimed at alleviating the housing shortage, particularly as it affected veterans of World War II and their families, by giving preferences to such veterans "at sales prices or rentals within

their means." A housing expediter was appointed with various broad powers, including the power to establish maximum sales prices, and to allocate and fix priorities for housing materials. Sales in excess of the ceiling price were prohibited.

Section 5 of the act is one of the provisions here involved. It reads as follows: "It shall be unlawful for any person to effect, either as principal or *broker*, a sale of any housing accommodations at a price in excess of the maximum sales price applicable to such sale under the provisions of this Act, or to solicit or attempt, offer, or agree to make any such sale. It shall be unlawful for any person to violate the terms of any regulation or order issued under the provisions of this Act. Notwithstanding any termination of this Act as contemplated in section 1(b) hereinabove, the provisions of this Act, and of all regulations and orders issued thereunder, shall be treated as remaining in force, as to rights or liabilities incurred or offenses committed prior to such termination date, for the purpose of sustaining any proper suit, action, or prosecution with respect to any such right, liability or offense."

Section 6 provides for judicial review of any action or ruling made pursuant to any regulation or order issued under the authority of the act.

Section 7 provides for the civil and criminal penalties for violations of the act. So far as criminal responsibility is concerned, the violation must be willful (subsec. b). Subsection (c) gives the district, state and territorial courts concurrent jurisdiction of all proceedings brought under this section.

Section 7(d) reads as follows: "If any person selling housing accommodations violates a regulation or order prescribing a maximum selling price, the person who buys such housing accommodations may, within one year from the date of the occurrence of the violation, bring an action for the amount by which the consideration exceeded the maximum selling price, plus reasonable attorney's fees and costs as determined by the court."

Section 8(a) contains the following definition: "The term 'maximum sales price' means the maximum price for which any housing accommodations the construction of which is completed after the effective date of this Act may be sold and includes the total consideration which may be paid by the buyer for such housing accommodations with accompanying land and improvements, excluding only those incidental charges, such as brokerage fees or commissions or charges,

which buyers or sellers of such housing accommodations customarily assume in the community where such accommodations are located and which actually have been incurred for services rendered at the buyer's or seller's request."

It will be noted that under section 5 it is made unlawful for any person including an owner or broker to effect a sale in violation of the act. But under section 7(d), which is the specific section dealing with the right of the veteran to recover sums paid in excess of the ceiling price, it is the "person selling housing accommodations" that is made responsible.

### Basic Question Involved

The basic question involved is whether or not a veteran buyer who pays more than the ceiling price can recover the excess when he knew of the price ceiling, when he knowingly made an offer in excess of the price ceiling, when he importuned the seller to accept the offer and when the seller acted in good faith.

### Main Contentions of the Parties

Appellants argue that the purpose and object of the act was to protect veterans, and that whenever a veteran, voluntarily or involuntarily, pays more than the ceiling price for the property, he may recover the excess. The fact that the veteran entered the transaction with his eyes wide open and with full knowledge of what he was doing, or that the non-veteran acted on representations of employees of the F.H.A., are immaterial factors, in a civil action, according to appellants.

Shapiro makes several arguments in reply. He contends that the evidence and findings demonstrate that he acted in good faith, and in reliance upon the representations of an F.H.A. employee that a trade would not violate the act, and urges that this alone is a complete defense to the action. He also contends that appellants were not damaged and were *in pari delicto*. Cockroft, in addition, argues that the statute places no civil liability on a broker.

### Liability of Shapiro

█ All of the arguments of Shapiro are unsound. In the first place, as a matter of law, under the provisions of the act and particularly under the definition of "maximum selling price" contained in section 8(a), quoted *supra*, it is quite clear, and no serious contention can be made to the contrary, that a trade in which the property traded by the veteran

is deliberately and admittedly undervalued so as to bring the property received by the veteran ostensibly within the ceiling price, violates the act. If this were not the law the statute might just as well not have been passed. There would be a loophole in the act as big as the act itself. All of the war-inspired price ceiling and price regulation statutes follow the same pattern. The courts have quite uniformly condemned trade in transactions where the value of the property traded was deliberately undervalued by the seller of the price regulated property as a device to avoid price limitations. *Fuller* v. *Borkin,* 163 F.2d 887, illustrates how far the courts have carried this principle. That was an action by a buyer of a used automobile against the seller to recover an overcharge in claimed violation of O.P.A. price regulations. The transaction involved a bona fide trade. The buyer was given a credit of $115 for the car traded in by him. The seller expended $32.70 on repairs, and sold the traded-in car for $225. The district court held that the fair value of the trade-in was the test of whether there had been a violation, and fixed such fair value at $192.30 ($225 selling price, less $32.70 on repairs). It then used this fair value figure in determining the amount of the overcharge. This was unanimously affirmed. The case is quite significant here not only because it holds that in a trade for price controlled property the traded-in property must be valued at its fair market value, but also because of the method used by the court to determine the amount of the overcharge—the price for which the car was resold within a short period. Using that measure here, appellants' property would be valued at $11,250, the amount for which it was sold to the Carrs.

In the second place, if it be assumed contrary to law that a bona fide trade transaction would not violate the act, or if it be assumed that if it did violate the law an estoppel could be predicated upon the representations of an F.H.A. employee that a trade would not violate the law, and that good faith reliance on such representation would be a defense (which assumptions are all contrary to law), the undisputable fact here is that this transaction was not a bona fide trade. Elmers offered to trade, the title papers in his transaction gave the appearance of a trade, and he actually thought he was entering into a trade, but the true fact is that Shapiro never accepted that offer. The uncontradicted evidence is that he told Cockroft he would not accept the Elmers' house

in trade, and admittedly he never accepted Elmers' offer. He told Cockroft that he would give him two weeks to sell the Elmers' property and get the cash. If the Elmers' property had not been cashed out in the transaction, appellants would have had no legal right to secure the duplex. The title papers were then prepared to give the appearance of a trade from appellants to Shapiro. He in turn deeded the Elmers' property to his son for a fictitious consideration of $5,700, which was never paid, and the son deeded it to the Carrs for $11,250, which sum was admittedly then paid to Shapiro. The transaction was clearly not a trade at all but, at least so far as Shapiro is concerned, a clear-cut sale of the duplex for $19,250. Thus there could not have been good faith reliance on any representation that a trade would not violate the act because no trade was ever made.

The third and complete answer to the points urged by Shapiro is that even if it be assumed, contrary to the fact, that Shapiro relied and acted in good faith reliance upon the representations of the F.H.A. representative, such assumption would not assist Shapiro. Under the terms of the statute above quoted, willfulness plays no part in a civil proceeding brought to recover an overcharge. The only question presented in such a civil proceeding is whether in fact an overcharge has been made. Good faith or willfulness are not integral parts of the cause of action. They become important only in criminal prosecutions under the act. This is clearly demonstrated by a reference to the statute. Section 7(b) provides for criminal prosecutions where the violation has been "willful," but section 7(d), which permits a civil action by the purchaser, omits the word "willful" and provides that such an action will lie where "any person selling housing accommodations violates a regulation or order prescribing a maximum selling price." The purpose of the civil remedy is to allow recovery of the excess paid and to prohibit the seller from receiving and keeping such excess. The good faith or intent of the seller is immaterial in such an action.

We have been cited to no case, and we have found none, so interpreting the statute under discussion, but there are many cases decided under the Emergency Price Control Act of 1942 (56 Stats. 33 as amended, 50 U.S.C.A.App., § 925) so holding, and that statute is substantially similar in language and purpose to the one under consideration. Under section 205(e) of that statute a buyer was permitted to recover from the seller all overcharges. The statute provided that if the violation

were "willful" the buyer could collect treble the amount of the overcharge, but where not willful the buyer could only recover the amount of the overcharge. In *Bowles* v. *Hasting,* 146 F.2d 94, it appears that a seller of lumber overcharged the buyer for some lumber. The district court found the violation was not willful, denied damages but granted an injunction against future violations. This was reversed by the Fifth Circuit, that court stating (p. 95): "Willfulness in violation is made a necessary ingredient for criminal punishment. . . It is not made necessary in the civil suit. When an excess in price is charged the damage is done, and the excess must be repaid. . . . The Court has no discretion . . . to withhold the damages."

*Porter* v. *Maule,* 160 F.2d 1 was an action brought against the seller of building blocks to recover treble damages. The defense was that the blocks were not subject to ceiling prices, and that the office of the O.P.A. had so informed the seller. The trial court determined that the seller had acted in good faith and in reliance on the agency's approval. This was reversed on the ground that, although such a defense might avert liability for treble damages, it was not a defense to an action to recover the amount of the overcharge.

Even where the action is brought by the government, and the defendant proves he relied upon the advice given him by the local rent examiner, the court has no discretion but must grant damages against the defendant. This was the precise holding in *Porter* v. *Deer,* 160 F.2d 394, where it was held that (p. 396): ". . . the fact that appellee acted upon the suggestion of the rent examiner in re-registering the house is no defense, even though the advice of the rent examiner was given with full knowledge of the facts. At most, such a showing would establish only the good faith of the appellee and reduce the penalty to the actual overcharge." In *Fleming* v. *Hanscom,* 162 F.2d 164, the defendant acted in reliance upon an unofficial interpretation of a price regulation contained in a letter from the O.P.A. The Ninth Circuit held that, while this showed good faith, this only operated to reduce the damages to the amount of the overcharges, and stated (p. 166): "Appellees were not entitled to rely on an unofficial interpretation, nor was the Administrator thereby estopped from prosecuting this action."

These cases demonstrate that in such actions all that is involved is the question of whether there was an overcharge;

754

if so, it may be recovered, and good faith is entirely a false issue. (See 50 U.S.C.A.App., § 925; 1947 Cum. Annual Pocket Part, pp. 313-320, where many cases are collected on this point.)

■ Shapiro next urges that appellants are *in pari delicto* and therefore cannot prevail in this proceeding. It is pointed out that the trial court has found that Elmers, with full knowledge of all the facts, offered to trade his house and $8,000 cash for the duplex, and then importuned Shapiro to enter into the transaction. It is, of course, a general rule that neither party to an illegal transaction may secure the restoration of property or money transferred in the course of the illegal transaction. Such parties are said to be *in pari delicto* and neither may recover from the other. There has always been a judicial aversion to aiding a malefactor in profiting from his own wrong so that in such cases the court will leave such parties where it finds them. But such rules have no application to transactions illegal because in violation of a statute, where such statute is aimed at protecting one of the parties to the transaction. In such cases there is no parity of *delictum,* and the one protected by the law may, at any time, resort to the law to recover money paid even though the illegal transaction is completed. (2 Restatement of Contracts § 601; 12 Am.Jur. § 217, p. 734; see many cases collected and commented upon, 120 A.L.R. 1461.)

■ The present statute was obviously passed to protect veterans. It so states. The penalties are all imposed upon those who deal with veterans and violate the law. None is imposed on veterans. The veteran commits no offense in paying an excessive price. Although we are not aware of any case decided under the present statute, there are many cases decided by both state and federal courts under the Emergency Price Control Act, and other price fixing statutes passed during and after the war, which have held that knowledge of the illegality of the price being paid does not bar the buyer in a civil action from recovering the overcharge. (See *Schaubach* v. *Anderson,* 184 Va. 795 [36 S.E.2d 539]; *Zwang* v. *A. & P. Food Stores,* 181 Misc. 375 [46 N.Y.S.2d 747].) In *Kenney* v. *Hood,* 158 F.2d 226, the plaintiff brought an action for treble damages on a claimed overcharge in the sale of a refrigerator. The defense was that the seller had agreed to sell at a fixed price provided there was no ceiling price, and that the buyer, after ascertaining that there was a ceiling price, bought the refrigerator without informing the seller of the

ceiling, and for the purpose of obtaining treble damages. The trial court held that this lack of willfulness was a defense to the action to recover treble damages, but was no defense to recover the amount of the overcharge. The Fifth Circuit in unanimously affirming this holding stated (p. 227): "What appellant is urging, that the sale was the result of fraud on plaintiff's part or of mutual mistake, might well have availed him if he had brought a timely action to rescind. It is completely unavailable as a defense to a suit under the section for an overcharge. This has been decided so many times in this and other circuits that one or two citations will suffice. (*Bowles* v. *Hasting*, 5 Cir., 146 F.2d 94; *Bowles* v. *Indianapolis*, 7 Cir., 150 F.2d 597; *Shearer* v. *Porter*, 8 Cir., 155 F.2d 77.)"

The fact that Shapiro's costs of construction may have exceeded the maximum ceiling price is an immaterial factor. His remedy was by judicial review of the F.H.A.'s determination specifically accorded him under section 6 of the act. This remedy he did not elect to pursue. He proceeded to construct the building with priority material with full knowledge of the ceiling price, apparently in the hope that the statute would be repealed. The case of *United States* v. *Duke Building Corp.*, 79 F.Supp. 681, is a good illustration of how the courts have construed such statutes. That case arose under the Housing and Rent Act of 1947, the act that succeeded the one here involved. There, at the request of the purchasers, and before the contract of sale had been entered into, the sellers agreed to make certain changes and additions to the house not called for or included in the plans approved by F.H.A. These were installed at actual cost and no priority materials were used in making them. The purchasers agreed to pay for these additions with full knowledge of all the facts. The sellers were compelled to refund the sums received for such additions. In so holding the court stated the applicable principles as follows (p. 683): "It was the purpose of Congress to insure a fair distribution of critical materials when it passed the Housing and Rent Act of 1947, . . . and whoever received a priority rating bound himself to comply with the terms of his application which in this instance fixed the selling price at $7,750. If for some valid reason he desired a change of plans or price it was necessary that he make written application to the Administrator and receive prior authority from him before making any change. Congress declared a general policy and one who takes advantage of the

act must follow its terms strictly. His accepted application amounts to a contract with the government and the only way he can deviate from its terms is as authorized by the act. In this case the defendants agreed if given a priority rating they would build these houses according to the plans filed and sell them for $7,750. They are bound by it. They cannot plead estoppel or agreement to the contrary of the application without first receiving authority from the Administrator. If this were not the law one could very easily evade its terms after having received his priority rating and this is one of the things Congress intended should not be done." The rule of this case is clearly applicable here.

For these reasons it is quite clear that Shapiro is liable for the amount of overcharge, and that as to him and his wife, the judgment must be reversed.

### Liability of Cockroft

Cockroft makes all the contentions made by Shapiro, and, in addition, contends that in any event the statute involved does not make the broker civilly liable. This contention is based upon the fact that section 5 of the act, by express language, makes the act of a broker, in handling the sale of housing accommodations in excess of the maximum ceiling, unlawful, and section 7(b) provides for the criminal prosecution of such acts. Section 7(d), the section which provides for the civil action by the purchaser, and the section under which the present action is brought, uses language fundamentally different from that used in section 5. It allows the purchaser to bring the action against "any person selling housing accommodations." The question is whether or not a broker is a "seller" of housing accommodations within the meaning of section 7(d). Under comparable statutes the cases are in conflict. In *Bowles* v. *Cardinal Cutlery Corp.*, 69 F.Supp. 435, the District Court for the Southern District of New York gave exhausive consideration to this problem and concluded that "seller" meant the retailer or wholesaler, or the owner of the property, and did not include officers of the corporation that had negotiated the sale. The District Court for the Southern District of California came to the same conclusion in *Porter* v. *Schaefer*, 69 F.Supp. 1013, where the salesman of a wholesale firm was held not subject to a civil action by the price administrator although the court pointed out that he would be subject to criminal prosecution or to the injunctive process. In *Cochran* v. *Nelson*, 26 Wn.2d 82 [173

P.2d 769], the Supreme Court of Washington held that an auctioneer was not liable to the buyer for an overcharge paid on the purchase of a washing machine. There are cases the other way. (They are cited and commented upon in *Porter* v. *Schaefer,* and *Bowles* v. *Cardinal Cutlery Corp., supra.*)

The reasoning of the above cases seems sound to us. The statute clearly makes a distinction between civil and criminal liability. The purpose of section 7(d) is to permit the veteran to recover the overcharge from the person who received it. It is not a general damage statute at all. The broker did not receive the overcharge and is therefore not liable under section 7(d).

Nor can the broker be held liable under the theory of fraud or conspiracy. It may be assumed that, had the trial court found that Cockroft was fraudulent or that he conspired to violate the act, such findings would be supported. Nevertheless, the trial court, on conflicting evidence, has found the other way. Moreover, if, as we have already held, the provisions of the statute impose no liability on the broker, it is most difficult to see how appellants were damaged by such fraud or conspiracy. Without the statute, there would be no damage. Admittedly, the duplex is worth more than was paid for it. Admittedly, the duplex is worth $8,000 more than the Elmers' property. Therefore, there were no general damages. While the broker concealed from Elmers the fact that his home was being "cashed out" in the deal for $11,250, Elmers testified that he thought his home was worth $12,000, and yet was not only willing, but was anxious to enter into the transaction. It appears from the record that, had appellants known every fact now claimed to have been concealed, nevertheless they would have insisted upon going through with the transaction.

For the same reasons Shapiro's son and daughter-in-law cannot be held liable.

The judgment as to John B. Cockroft, John B. Cockroft & Company, Leonard E. Shapiro and Amelia G. Shapiro is affirmed; as to Harry Shapiro and Molly Shapiro it is reversed.

Ward, J., and Bray, J., concurred.

A petition for a rehearing was denied June 10, 1949, and appellants' and respondents' petitions for a hearing by the Supreme Court were denied July 7, 1949. Carter, J., voted for both petitions for a hearing. Schauer, J., voted for respondents' petition for a hearing.