[No. H021971. Sixth Dist. Aug. 11, 2003.]

THE PEOPLE ex rel. GEORGE W. KENNEDY, as District Attorney, etc., Plaintiff and Respondent, v.
BEAUMONT INVESTMENT, LTD., et al., Defendants and Appellants.

**COUNSEL**

Law Office of Frederik A. Jacobsen, Frederik A. Jacobsen; Law Office of Diane Wilkens Medina and Diane Wilkens Medina for Defendants and Appellants.

George Kennedy, District Attorney, and Kenneth Rosenblatt, Deputy District Attorney for Plaintiff and Respondent.

**OPINION**

**WUNDERLICH, J.**—This civil appeal follows judicial proceedings involving San Jose's mobilehome rent control ordinance.

*The Parties:* Appellants are Beaumont Investments, Ltd., which owns Lamplighter Mobilehome Park, and San Jose Investments, Ltd., which owns Casa Del Lago Mobilehome Park (collectively, defendants). Respondent is the People of the State of California (plaintiff).

*The Ordinance:* The City of San Jose (the City) has enacted and administers a mobilehome rent control ordinance (the Ordinance). (San Jose Municipal Code, tit. 17, ch. 17.22.)[1] The Ordinance seeks to protect mobilehome park residents from unreasonable rent increases. (§ 17.22.020.) Residents may forgo those protections by voluntarily entering long-term leases, which are exempt from rent control. (§ 17.22.370, subd. A.)

*Summary of Proceedings Below:* Plaintiff's complaint for unfair business practices alleged that defendants violated the Ordinance by unlawfully forcing mobilehome park tenants to accept long-term leases in order to avoid rent control. Following a lengthy bench trial, the court concluded that defendants had violated the Ordinance and that those violations constituted unfair business practices. The court entered judgment against defendants, which requires them to pay $525,000 in restitution and $525,000 in civil penalties.

*The Appeal:* On appeal, defendants dispute the trial court's determination that they violated the Ordinance. Defendants challenge both the restitution order and the award of civil penalties on other grounds as well.

---

[1] Further section references are to chapter 17.22 of title 17 of the San Jose Municipal Code unless otherwise stated.

As we explain below, we affirm the judgment.

## BACKGROUND

For context, we begin with a brief overview of mobilehome tenancies. Against that backdrop, we set forth the factual and procedural history relevant to this appeal.

### I. *Mobilehome Tenancies*

In California, mobilehome tenancies are governed by the Mobilehome Residency Law. (Civ. Code, § 798 et seq.) The law "extensively regulates the landlord-tenant relationship between mobilehome park owners and residents." (*Greening v. Johnson* (1997) 53 Cal.App.4th 1223, 1226 [62 Cal.Rptr.2d 214].)

The protections afforded by the Mobilehome Residency Law reflect legislative recognition of the unique nature of mobilehome tenancies. (See Civ. Code, § 798.55, subd. (a).) Ordinarily, mobilehome park tenants own their homes but rent the spaces they occupy. (See, e.g., § 17.22.010, subd. C.) Once a mobilehome is in place in a park, it is difficult to relocate. (§ 17.22.010, subd. D; *Yee v. Escondido* (1992) 503 U.S. 519, 523 [118 L.Ed.2d 153, 112 S.Ct. 1522]; *Greening v. Johnson, supra,* 53 Cal.App.4th at p. 1226; *Rancho Santa Paula Mobilehome Park, Ltd. v. Evans* (1994) 26 Cal.App.4th 1139, 1147 [32 Cal.Rptr.2d 464].) Its owner thus "is more likely to be a long-term resident." (*Rancho Santa Paula Mobilehome Park, Ltd. v. Evans, supra,* 26 Cal.App.4th at p. 1147.) In many cases, mobilehome park tenants have limited and undesirable options if they find "living in the park no longer desirable, practical, or possible ...." (*Ibid.*)

Given the singular nature of mobilehome tenancies, mobilehome park tenants are particularly vulnerable both to eviction and to rent increases. For that reason, California's Mobilehome Residency Law protects mobilehome owners against arbitrary evictions. (See, e.g., Civ. Code, § 798.55; *Yee v. Escondido, supra,* 503 U.S. at p. 524.) The state law affords these protections even to mobilehome park residents in month-to-month tenancies. Locally, the Ordinance offers such residents protection from unreasonable rent increases. (See, e.g., §§ 17.22.450–17.22.590.) Residents may forgo the Ordinance's rent safeguards by voluntarily entering rental agreements with terms longer than one year, which are exempt from rent control under the local act. (§ 17.22.370, subd. A; see also, Civ. Code, § 798.17.)

### II. *Factual Background*

Starting in 1987, defendants entered into a number of long-term leases for lots in their respective mobilehome parks. Some of the leases included

renewal provisions that resulted in effective terms as long as 25 years. Defendants' long-term leases fell into two categories.

One category of long-term leases consists of those that defendants made directly with residents of their parks (direct leases).[2]

In the second category are long-term leases that defendants made with mobilehome dealers (dealer leases). Two dealers were parties to the dealer leases at issue here: New Horizon Mobile Homes and United Mobile Homes. Consistent with common practice, the dealers placed new mobilehomes for sale in spaces in defendants' parks. The dealers signed long-term leases for those spaces. Upon sale of the mobilehome sited there, the purchaser (the prospective resident of the park) was required to assume the dealer lease or to sign a new long-term lease with similar terms. As long-term lessees, the dealers' customers were not protected by the rent control provisions of the Ordinance.

III. *Procedural History*

Acting through the Santa Clara County District Attorney, plaintiff filed this civil action for unfair business practices in December 1995. In addition to defendants, the complaint named a mobilehome dealership, New Horizon Mobile Homes, and its owner, Faramarz (John) Naimi.[3] In August 1998, plaintiff filed an amended and supplemental complaint.

In May 1999, defendants demurred to the amended complaint and also moved to strike part of its prayer. In July 1999, the court overruled defendants' demurrer, denied their motion to strike, and ordered them to answer the complaint.[4]

In July 1999, defendants cross-complained against the City, asserting that the Ordinance effected an unconstitutional taking. The trial court bifurcated proceedings on the cross-complaint.[5]

In December 1999, plaintiff moved for leave to further amend its complaint by adjusting the dates in the third and fourth causes of action and by revising

---

[2] The direct leases are not at issue in this appeal. The trial court concluded that plaintiff failed to prove its allegations of unfair business practices except in connection with the dealer leases. Plaintiff has not appealed that determination.

[3] The other named defendants are not parties to this appeal.

[4] The record on appeal does not contain defendants' answer.

[5] In the bifurcated cross-action, the trial court eventually sustained the City's demurrer to the third amended cross-complaint. It later entered a judgment of dismissal, which is the subject of a separate appeal in this court. (*Beaumont Investments, Ltd. v. City of San Jose*, Aug. 11, 2003, H023861 [nonpub.opn.].)

the prayer. The court later granted the motion, when plaintiff renewed it during trial. As amended, the complaint asserted nine causes of action, all alleging unfair business practices in violation of state statutes. (Bus. & Prof. Code, § 17200 et seq.)

The matter proceeded to court trial. Opening statements were heard on January 4, 2000. In the ensuing weeks, dozens of witnesses testified, and more than 100 exhibits were received in evidence. Closing arguments were made on February 25, 2000.

The court issued its notice of intended decision shortly thereafter. The court announced its intent to render judgment for plaintiff and against defendants on the third and fourth causes of action of the amended complaint, concluding: "None of the other claims set forth in the complaint were proved."

Both parties requested a statement of decision. In May 2000, the court issued two statements of decision, one in response to each side's request.[6]

As relevant here, the court concluded that "the dealer leases were not exempt from the Ordinance. Defendants nonetheless required prospective tenants purchasing new mobile homes from United Mobilehomes and New Horizon to assume dealer leases or sign new long-term leases with the identical terms." By thus enforcing the dealer leases against consumers, the court explained, defendants violated Ordinance provisions that "prohibit park owners from requiring prospective tenants to sign long-term leases as a condition of tenancy." The court further determined: "Those violations of the Ordinance constituted separate and independent violations" of the unfair practices law. The court also found that defendants conspired with the dealers to violate the Ordinance and the statute.

The court determined that violations occurring as early as January 1, 1987, were actionable. It first explained: "Those long-term leases were never exempt. Defendants committed an unlawful business practice each time they collected above-Ordinance rents on those leases." It further explained: "The statute of limitations does not begin to run on wrongful acts committed pursuant to a civil conspiracy until the completion of the last overt act of that conspiracy. [Citation.] ... Therefore, the statute of limitations has not begun to run on defendants' violations of [Business and Professions Code section] 17200 because defendants are still enforcing their unlawful long-term leases."

---

[6] Because plaintiff did not appeal, we discuss only the statement of decision issued in response to defendants' request.

In June 2000, the court entered judgment, which it modified later that month. The judgment includes a permanent injunction that prohibits defendants from charging rents in excess of permissible amounts under the rent control provisions of the Ordinance. The judgment also requires defendants to pay $525,000 in restitution, divided among more than 150 affected tenants in specified amounts. In addition, the judgment imposes civil penalties totaling $525,000: $420,000 against defendant Beaumont Investments and $105,000 against defendant San Jose Investments.

In August 2000, the court denied defendants' motions to vacate the judgment and for a new trial.

In September 2000, defendants filed their notice of appeal from the modified judgment and from the denial of their posttrial motions. In October 2000, this court denied defendants' petition for a writ of supersedeas, by which they sought a stay of the injunctive provisions of the judgment pending resolution of this appeal. Shortly thereafter, we dismissed the appeal for failure to file the required California Rules of Court, rule 19.5 statement; we later reinstated it on defendants' motion. The appeal now stands fully briefed, argued and ready for our resolution.

## CONTENTIONS

Defendants make the following contentions in this appeal:

I. The trial court erred in finding that the dealer leases violated the Ordinance.

II. The trial court erred in imposing the civil penalties. The court was without jurisdiction to determine and punish Ordinance violations in the first instance, absent prior administrative notice of violation and an opportunity to cure. Alternatively, even if the court had jurisdiction to impose civil penalties, it abused its discretion by setting penalties that were excessive under the circumstances.

III. The trial court erred in ordering restitution. The court erred as a matter of law in partially rescinding the leases. As a result, the court employed an erroneous restitution formula.

IV. The trial court erred in resolving the limitations issue, because it applied the wrong legal standard in finding a civil conspiracy.

## DISCUSSION

We address defendants' contentions in turn, starting in each instance with a discussion of the general legal principles that inform our analysis.

## I. Violation of Ordinance

The judgment rests in the first instance on the trial court's determination that defendants violated the Ordinance by using unlawful long-term dealer leases to avoid rent control. Defendants assign this determination as error. To analyze defendants' claim of error, we must construe the Ordinance.

### A. Standard of Review

■ Interpretation of the municipal rent control ordinance presents a question of law for our independent review. "We interpret ordinances by the same rules applicable to statutes. [Citation.] Statutory interpretation is ultimately a judicial function." (*Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 290 [82 Cal.Rptr.2d 569].)

### B. Rules of Construction

We begin our analysis with familiar rules of statutory construction. "Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 [241 Cal.Rptr. 67, 743 P.2d 1323].) In determining legislative intent, we first look to the statutory language itself. (*Ibid;* see also, *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047 [80 Cal.Rptr.2d 828, 968 P.2d 539].) "The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387.)

### C. The Ordinance

The question before us is whether the long-term dealer leases violate the Ordinance. Answering that question requires resort to the applicable portions of the Ordinance.

We first consider section 17.22.370 (hereafter section 370) of the Ordinance.[7] Both parties agree that section 370 is relevant to the analysis here. ■ That

---

[7] Section 370 reads in full as follows: "A. The provisions of this chapter shall not apply to any mobilehome lot which is the subject of a rental agreement voluntarily entered into between a landlord and mobilehome owner where the rental agreement meets all of the following criteria: [¶] 1. The rental agreement was entered into on or after January 1, 1986. [¶] 2. The term of the rental agreement is in excess of twelve months' duration. [¶] 3. The mobilehome lot which is the subject of the rental agreement is used for the personal and actual residence of

section exempts from rent control those mobilehome tenancies governed by voluntary rental agreements that meet certain enumerated criteria. (§ 17.22.370, subd. A [hereafter section 370A].)

■ In this case, the provision's critical requirement is that the space must be "used for the personal and actual residence of the mobilehome owner." (§ 370A, ¶ 3.) Defendants do not dispute the plain meaning of that requirement. Nor do they claim that the requirement was met; to the contrary, defendants apparently concede that the dealers who signed the leases did not personally and actually reside in the mobilehomes they placed for sale in defendants' parks.

Defendants' assertion that the dealer leases were exempt from rent control instead rests on another provision of the Ordinance, section 17.22.2000 (hereafter section 2000).[8] According to defendants, section 17.22.2000, subd. D (hereafter section 2000D) "expands the universe of exempt lessees." Defendants bolster that claim with arguments based on Ordinance language, on policy, and on evidence suggesting that the City agrees with defendants' interpretation, that evidence being an August 1992 memorandum by an assistant city attorney. Not surprisingly, plaintiff disagrees. In support of its view, plaintiff analyzes the Ordinance's language and structure, refers us to its stated purpose, and questions defendants' reliance on the 1992 city attorney memorandum.

---

the mobilehome owner. [¶] 4. The first paragraph of the rental agreement contains a provision notifying the mobilehome owner that the mobilehome lot will be exempt from the provisions of this chapter. [¶] B. This exclusion shall apply only for the duration of the term of the rental agreement and any uninterrupted, continuous extensions thereof. If the term of the rental agreement is not extended and no new rental agreement meeting the above-stated criteria is entered into, this chapter shall immediately become applicable to the mobilehome lot and the last rental rate charged for the lot under the immediately preceding rental agreement shall be the rent for purposes of determining the base rent under this chapter."

[8] Section 2000 reads in full as follows: "A. Any waiver of purported waiver by a mobilehome owner or mobilehome tenant of rights granted under this chapter prior to the time when such rights may be exercised shall be void as contrary to public policy, except as provided in Section 17.22.370. [¶] B. It shall be unlawful for a landlord to require or attempt to require, as a condition of tenancy in a mobilehome park, a mobilehome owner, mobilehome tenant, prospective mobilehome owner, or prospective mobilehome tenant to waive in a lease or rental agreement the rights granted to a mobilehome owner or mobilehome tenant by this chapter. [¶] C. It shall be unlawful for a landlord to deny or threaten to deny tenancy in a mobilehome park to any person on account of such person's refusal to enter into a lease or rental agreement or any other agreement under which such person would waive the rights granted to a mobilehome owner or mobilehome tenant by this chapter. [¶] D. Nothing in this section shall preclude a mobilehome park landlord and a mobilehome owner, mobilehome tenant, prospective mobilehome owner or prospective mobilehome tenant from entering into a lease described in Section 17.22.370 provided that such lease or rental agreement is not procured by a requirement that it be entered into as a condition of tenancy in the mobilehome park and is not procured under threat of a denial of tenancy in the mobilehome park."

As we explain below, we reject defendants' interpretation of the Ordinance, based on our analysis of the Ordinance's language, structure, and purpose. Defendants' evidence does not convince us otherwise. Additionally, we find further support for our determination in state statutory law.

### 1. *Language*

In support of their claim that section 2000D "expands the universe of exempt lessees," defendants first rely on linguistic differences between that section and section 370A. Defendants point out that section 370A refers only to "mobilehome owners" in describing renters who may enter exempt agreements. (§ 370A.) By contrast, defendants observe, section 2000D recognizes the right of "a mobilehome owner, mobilehome tenant, prospective mobilehome owner or prospective mobilehome tenant" to enter into an exempt lease "described" in section 370A. (§ 2000D.) Given the inclusion of additional parties, defendants conclude, section 2000D "differentiates a 'mobilehome owner' from a 'mobilehome tenant.' If this differentiation is to be given meaning, as it must, then clearly the Ordinance is distinguishing between a tenant residing in the mobilehome and a non-resident owner of the mobilehome."

We find that argument unpersuasive. First, in our view, the provision's inclusion of mobilehome tenants as well as mobilehome owners is explained by resort to the Ordinance's definitions of those terms. ■ A mobilehome tenant is defined as one "who rents or leases a *mobilehome* from a mobilehome owner." (§ 17.22.210, italics added.) A mobilehome owner is one with the right to use a mobilehome *lot*. (§ 17.22.180, italics added.) A mobilehome owner who rents his mobilehome to another becomes a "landlord" within the meaning of the Ordinance. (§ 17.22.150 [defining "landlord" to include "a mobilehome park owner, mobilehome owner, lessor or sublessor who receives or is entitled to receive rent for the use or occupancy" of a mobilehome or a mobilehome lot].) Second, it appears to us that the inclusion of "prospective" owners or tenants in section 2000D simply reflects the understanding that a rental agreement may precede occupancy by the mobilehome's ultimate "resident." (See § 17.22.200 [defining "mobilehome resident" as "a person, including a mobilehome owner or mobilehome tenant, who occupies a mobilehome"].)

The enumeration of the wider variety of potential rentpayers listed in section 2000D is simply unnecessary in section 370. ■ Within the context of section 370, a "mobilehome owner" can only mean a mobilehome park tenant. The two are one and the same, because section 370 governs the lease of a mobilehome *lot* to one who personally and actually *resides* in his mobilehome on that lot. Thus, for purposes of section 370, the lessor will

always be the park owner (the owner of the lot) and the lessee will always be the mobilehome owner who personally resides there. (Cf., Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2002) ¶ 11:25, p. 11-6 [for purposes of Mobilehome Residency Law, "distinction between park 'homeowners' and 'residents' is significant"]; *id*, ¶ 11:28, p. 11-7 [Mobilehome Residency Law provisions governing rental agreements do not apply to residents who lease from park owners both a park-owned mobile-home and its lot].)

With the foregoing understanding of the provisions' distinct contexts, it becomes clear that the linguistic differences between the two sections do not compel or even suggest the conclusion that the latter expands the former.

Defendants further argue: "The very language of [section] 2000D shows that it expands on [section] 370. [Section] 2000D refers to the leases 'described' in [section] 370. The term 'described' refers only to the type of rental or lease agreement, not the identity of the parties to the lease."

That argument likewise is without merit. The leases "described" in section 370 are those that meet the criteria enumerated in that section. One of those criteria is the requirement of "personal and actual residence" by the person renting the lot. (§ 370A, ¶ 3.) Regardless of whether the party obliged to pay the landlord is denominated a mobilehome owner or tenant, current or prospective, the rentpayer must use the space for his actual and personal residence. (§ 370A, ¶ 3.) Nothing in section 2000D alters that residency requirement, either expressly or by implication. To the contrary, by referring to the leases "described" in section 370, section 2000D necessarily incorporates the prior section's residency requirement.

Another aspect of section 2000D's language bolsters our conclusion that it was not intended to expand the universe of available exemptions. The subdivision expressly limits its operation to the section in which it is contained, with this introduction: "Nothing in this *section* shall preclude [section 370 leases]." (§ 2000D, italics added.)

In short, from the language of section 2000D, we conclude that the provision does not expand the universe of exempt leases under the Ordinance.

### 2. *Structure*

Our interpretation of section 2000D in relation to section 370 is further buttressed by an examination of the structure of the Ordinance and of the place that each section occupies within it. (Cf., e.g., *Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 986, 987 [44 Cal.Rptr.2d 93] [statutes

read together and considered in the context of the statutory framework as a whole].) As codified, the Ordinance consists of 11 parts.

Part 3 of the Ordinance is entitled "Exemptions." It describes three specific exemptions from the Ordinance's rent control provisions. One of those three exemptions is for long-term leases, as described in section 370. Part 3 also includes a provision that places the burden of proving an exemption on the landlord. (§ 17.22.390.)

Part 11 of the Ordinance is entitled "Enforcement." It includes section 2000, captioned "Waiver of Rights." That section begins with the pronouncement that any waiver of renters' rights is void except as provided in section 370. (§ 2000, subd. A.) Other sections of Part 11 outlaw and punish certain landlord behavior. (§§ 17.22.2010, 17.22.2020, 17.22.2030.)

Given this structure and the distinct character of Part 3 (Exemptions) and Part 11 (Enforcement), we are further persuaded that the City did not intend section 2000D to expand the Ordinance's limited universe of exemptions.

### 3. *Policy and Purpose*

Our interpretation of the Ordinance derives from its plain language in the context of its structure. Defendants nevertheless resist that interpretation on policy grounds, asserting that "from a policy perspective," it is "nonsensical to allow a mobilehome park tenant, who may not be very sophisticated" to enter exempt leases, while prohibiting relatively more savvy mobilehome dealers from doing so. For its part, plaintiff points out that one of the Ordinance's express purposes is reasonable rent for mobilehome park residents. (See § 17.22.020.)

Initially, we question the implicit premise that policy arguments may overcome the plain language of a statute. (See, e.g., *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 176, fn. 9 [96 Cal.Rptr.2d 518, 999 P.2d 706] [reliance on statutory purpose while ignoring statutory language is improper]. Cf., e.g., *People ex rel. Lockyer v. Fremont General Corp.* (2001) 89 Cal.App.4th 1260, 1266 [108 Cal.Rptr.2d 127] [rejecting policy arguments that "ignore the Legislature's plain expression of public policy"].) In any event, in our view, plaintiff has the better of the policy arguments.[9] The Ordinance's explicit purpose of protection for mobilehome

---

[9] To the extent that defendants' policy argument relies on their assessment of the lessees' sophistication, we observe that both local and state enactments provide certain protections to prospective long-term lessees. (See, e.g., § 370A, ¶ 4; Civ. Code, § 798.17, subds. (a)(2), (b)(3) & (4).)

park *residents* thus further supports our conclusion that the residency require-
ment of section 370 retains its vitality, unaffected by section 2000D.

#### 4. *Evidence*

In pressing their contrary interpretation of the Ordinance, defendants rely
heavily on a 1992 memorandum by an assistant city attorney, which was
placed in evidence at trial. According to defendants, the memorandum is
evidence both of the City's actual practice and of its interpretation of its own
ordinance, to wit, that the dealer leases are exempt from rent control under
the Ordinance.

Defendants' reliance on the memorandum is misplaced. We agree with the
trial court's analysis of this issue, as set forth in its statement of decision.
First, as the trial court concluded, the dealer leases at the heart of this action
are not the same as the dealer "pullouts" analyzed in the memorandum.[10]
Furthermore, even if the two types of dealer transactions were equivalent, the
memorandum is entitled to persuasive value at most. " 'As the matter is a
question of law, we are not bound by evidence on the question presented
below or by the lower court's interpretation.' " (*Village Trailer Park, Inc. v.
Santa Monica Rent Control Bd.* (2002) 101 Cal.App.4th 1133, 1140 [124
Cal.Rptr.2d 857], quoting *Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7
Cal.Rptr.2d 531, 828 P.2d 672].) Finally, whatever persuasive value the 1992
memorandum may have was eroded by a 1995 memorandum from the same
assistant city attorney. That later memorandum—written in response to
defendants' request for an opinion on the precise issue presented here—
concluded that the dealer leases are not exempt under the Ordinance. The trial
court took judicial notice of the 1995 memorandum, finding it "a persuasive
expression of the views of the City of San Jose that the dealer leases were not
exempt."

#### 5. *State Law*

Though neither party argues it, we find further support for our interpreta-
tion of the Ordinance in the Mobilehome Residency Law. (Civ. Code, § 798
et seq.) One provision of that law "delineates the limited circumstances under
which a mobilehome rental agreement is exempt from local rent control

---

[10] As defined in the Ordinance, a "dealer pullout" occurs when a dealer purchases a
mobilehome sited in a mobilehome park, removing the old mobilehome from the park and
replacing it with a new one, which is stored on the lot until sold. (See § 17.22.135.) The 1992
memorandum concluded that after a dealer pullout, the affected lot is no longer subject to rent
control. That conclusion rests in part on the determination that the dealers pay a storage
fee—not "rent"—as they do not receive "housing services." (See, §§ 17.22.240 [defining
"rent"], 17.22.140 [defining "housing services"].)

measures. (Civ. Code, § 798.17.)" (*Village Trailer Park, Inc. v. Santa Monica Rent Control Bd., supra,* 101 Cal.App.4th at pp. 1140–1141.) One condition for exemption under that provision is that the homeowner must use the rental as a personal residence. (Civ. Code, § 798.17, subd. (a); see also, *id.,* § 798.21.) Presumably, any local attempt to expand the limited universe of state law exemptions would be vulnerable to challenge on preemption grounds. (Cf., *Mobilepark West Homeowners Assn. v. Escondido Mobilepark West* (1995) 35 Cal.App.4th 32, 46 [41 Cal.Rptr.2d 393] [local ordinance impermissibly contradicts state law by adding additional requirements for exemption]; *Village Trailer Park, Inc. v. Santa Monica Rent Control Bd., supra,* 101 Cal.App.4th at p. 1141 [local ordinance does not conflict with state law regarding exemption from rent control].) Our construction of the Ordinance comports with its validity, consistent with statutory construction rules. (See, e.g., *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 129 [96 Cal.Rptr.2d 485, 999 P.2d 718] [where possible, court must construe statute to preserve its validity]; *Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 791 [90 Cal.Rptr.2d 598] [same; construction of ordinance].)

### D. *Conclusion*

The express language of section 370 establishes actual and personal residency of a mobilehome as a prerequisite to a long-term lease exempt from rent control under the Ordinance. The residency requirement of section 370 is not altered by section 2000D. The Ordinance's structure, its stated purpose, and state law all further bolster the conclusion that personal residency is a necessary prerequisite for exemption from rent control. ▮ Because the dealer leases failed to meet the residency requirement, they were not exempt. The trial court thus correctly determined that the dealer leases violate the Ordinance.

## II. *Civil Penalties*

By violating the Ordinance, the trial court concluded, defendants engaged in unfair business practices. As a consequence, the court imposed statutory civil penalties. Defendants challenge that award here.

### A. *Statutory Authority*

Defendants argue initially that the court lacked statutory authority to adjudicate violations and to award civil penalties. Plaintiff disputes that argument.

### 1. *Standard of Review*

■ The parties' dispute over the trial court's statutory authority presents a question of law, which we review de novo. (See, e.g., *Richman v. Santa Monica Rent Control Bd.* (1992) 7 Cal.App.4th 1457, 1464, fn. 3 [9 Cal.Rptr.2d 690] [applicability of the Petris Act].)

### 2. *Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.)*

The trial court determined that defendants violated California's statutory prohibitions against unfair business practices, a scheme commonly called the "unfair competition law" or "UCL." (Bus. & Prof. Code, § 17200 et seq.; see 11 Witkin, Summary of Cal. Law (2003 supp.) Equity, § 93, p. 467.)[11] ■ A UCL action may be predicated on violations of the false advertising law. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 51 [77 Cal.Rptr.2d 709, 960 P.2d 513].)

■ The law broadly defines unfair competition to include "any 'unlawful, unfair or fraudulent business practice.' " (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730], citing Bus. & Prof. Code, § 17200; see also, e.g., *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527]; *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143 [131 Cal.Rptr.2d 29, 63 P.3d 937].) Proscribed conduct "includes ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' [Citation.]" (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 383.) Violations of other laws, "when committed pursuant to business activity," become "independently actionable" under the UCL and subject to its remedies. (*Ibid.*; see also, e.g., *Korea Supply Co. v. Lockheed Martin Corp., supra,* 29 Cal.4th at p. 1143 ["Section 17200 'borrows' violations from other laws by making them

---

[11] As Witkin observes: "[Business and Professions Code section] 17200 et seq. do not bear a legislative title or name. The Supreme Court has variously referred to the statute as the Unfair Competition Act, the Unfair Business Practices Act, and the Unfair Practices Act. More recently, the court has referred to the statute as the Unfair Competition Law" and it " 'adhere[s] now to that locution.' " (11 Witkin, Summary of Cal. Law, *supra,* Equity, § 93, p. 467, quoting *Stop Youth Addiction v. Lucky Stores* (1998) 17 Cal.4th 553, 558, fn. 2 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

The relevant provisions appear in the Business and Professions Code at division 7. Provisions concerning unfair competition appear at division 7, part 2, chapter 4, article 6, starting with section 17200. For simplicity, we sometimes refer to these provisions as the "unfair practices law." Provisions more specifically directed at false advertising are contained in division 7, part 3, chapter 1, starting with section 17500, which prohibits false or misleading statements. For simplicity, we sometimes refer to these provisions as the "false advertising law."

independently actionable as unfair competitive practices."].) Those remedies are cumulative. (Bus. & Prof. Code, § 17205; *Cortez v. Purolator Air Filtration Products Co., supra,* 23 Cal.4th at p. 179.) The statutory remedies include civil penalties. (Bus. & Prof. Code, §§ 17206 [$2,500 civil penalty may be assessed for each violation of § 17200], 17536 [$2,500 civil penalty may be assessed for each violation of § 17500].)

### 3. *Petris Act (Civ. Code, § 1947.7)*

In challenging the trial court's authority to adjudicate statutory violations of the Unfair Business Practices Act, defendants rely on Civil Code section 1947.7.[12] That section is part of a statute that is sometimes referred to as the Petris Act. (Civ. Code, §§ 1947.7–1947.8; see *Sego v. Santa Monica Rent Control Bd.* (1997) 57 Cal.App.4th 250, 256 [67 Cal.Rptr.2d 68].)

---

[12] Civil Code section 1947.7 provides in full as follows:

"(a) The Legislature finds and declares that the operation of local rent stabilization programs can be complex and that disputes often arise with regard to standards of compliance with the regulatory processes of those programs. Therefore, it is the intent of the Legislature to limit the imposition of penalties and sanctions against an owner of residential rental units where that person has attempted in good faith to fully comply with the regulatory processes.

"(b) An owner of a residential rental unit who is in substantial compliance with an ordinance or charter that controls or establishes a system of controls on the price at which residential rental units may be offered for rent or lease and which requires the registration of rents, or any regulation adopted pursuant thereto, shall not be assessed a penalty or any other sanction for noncompliance with the ordinance, charter, or regulation.

"Restitution to the tenant or recovery of the registration or filing fees due to the local agency shall be the exclusive remedies which may be imposed against an owner of a residential rental unit who is in substantial compliance with the ordinance, charter, or regulation.

" 'Substantial compliance,' as used in this subdivision, means that the owner of a residential rental unit has made a good faith attempt to comply with the ordinance, charter, or regulation sufficient to reasonably carry out the intent and purpose of the ordinance, charter, or regulation, but is not in full compliance, and has, after receiving notice of a deficiency from the local agency, cured the defect in a timely manner, as reasonably determined by the local agency.

" 'Local agency,' as used in this subdivision, means the public entity responsible for the implementation of the ordinance, charter, or regulation.

"(c) For any residential unit which has been registered and for which a base rent has been listed or for any residential unit which an owner can show, by a preponderance of the evidence, a good faith attempt to comply with the registration requirements or who was exempt from registration requirements in a previous version of the ordinance or charter and for which the owner of that residential unit has subsequently found not to have been in compliance with the ordinance, charter, or regulation, all annual rent adjustments which may have been denied during the period of the owner's noncompliance shall be restored prospectively once the owner is in compliance with the ordinance, charter, or regulation.

"(d) In those jurisdictions where, prior to January 1, 1990, the local ordinance did not allow the restoration of annual rent adjustment, once the owner is in compliance with this section the local agency may phase in any increase in rent caused by the restoration of the annual rent adjustments that is in excess of 20 percent over the rent previously paid by the tenant, in equal installments over three years, if the tenant demonstrates undue financial hardship due to the restoration of the full annual rent adjustments. This subdivision shall remain operative only until January 1, 1993, unless a later enacted statute which is chaptered by January 1, 1993, deletes or extends that date.

"The purpose of the [Petris] Act is to exempt landlords who attempt good faith compliance with a rent control law from fines and penalties." (*Richman v. Santa Monica Rent Control Bd., supra,* 7 Cal.App.4th at p.1465.) The statute explicitly sets forth "the intent of the Legislature to limit the imposition of penalties and sanctions against an owner of residential rental units where that person has attempted in good faith to fully comply with the regulatory processes." (Civ. Code, § 1947.7, subd. (a).) The cited "regulatory processes" appear to be those related to the registration of rents and to the establishment of rent levels. (See, e.g., Civ. Code, § 1947.7, subd. (b) [describing the affected rent control ordinances as those requiring "the registration of rents"], subd. (c) [permitting the restoration of rent increases for landlord's "good faith attempt to comply with the registration requirements"], subd. (e) [referring to compliance with "applicable local rental registration requirements"], subd. (g) [describing the affected rent control ordinances as those requiring "the periodic registration of rents"]; see also, e.g., Civ. Code, § 1947.8, subd. (a) [describing the affected rent control ordinances as those requiring "the registration of rents" and requiring such ordinances to "provide for the establishment and certification of permissible rent levels for the registered rental units"]; see generally 1 Moskovitz et al., Cal. Landlord-Tenant Practice (Cont.Ed.Bar 2d ed. 2002) § 7.45, pp. 600–601 ["in a jurisdiction that requires registration of rent," Civil Code § 1947.7, subd. (b), prohibits the assessment of penalties against a landlord in substantial compliance with the local ordinance].) The act thus

"(e) For purposes of this subdivision, an owner shall be deemed in compliance with the ordinance, charter, or regulation if he or she is in substantial compliance with the applicable local rental registration requirements and applicable local and state housing code provisions, has paid all fees and penalties owed to the local agency which have not otherwise been barred by the applicable statute of limitations, and has satisfied all claims for refunds of rental overcharges brought by tenants or by the local rent control board on behalf of tenants of the affected unit.

"(f) Nothing in this section shall be construed to grant to any public entity any power which it does not possess independent of this section to control or establish a system of control on the price at which accommodations may be offered for rent or lease, or to diminish any power to do so which that public entity may possess, except as specifically provided in this section.

"(g) In those jurisdictions where an ordinance or charter controls, or establishes a system of controls on, the price at which residential rental units may be offered for rent or lease and requires the periodic registration of rents, and where, for purposes of compliance with subdivision (e) of Section 1954.53, the local agency requires an owner to provide the name of a present or former tenant, the tenant's name and any additional information provided concerning the tenant, is confidential and shall be treated as confidential information within the meaning of the Information Practices Act of 1977 (Chapter 1 (commencing with Section 1798) of Title 1.8 of this part). A local agency shall, to the extent required by this subdivision, be considered an 'agency' as defined in subdivision (b) of Section 1798.3. For purposes of compliance with subdivision (e) of Section 1954.53, a local agency subject to this subdivision may request, but shall not compel, an owner to provide any information regarding a tenant other than the tenant's name."

protects landlords who inadvertently make registration mistakes or who innocently establish rents at improper levels. (See, e.g., *Sego v. Santa Monica Rent Control Bd.*, *supra*, 57 Cal.App.4th at p. 257 [discussing the two purposes of the legislation, as described by its author, (1) to avoid " 'excessive fines' " for landlords who " ' "did not register correctly or did not fill in all the blanks," ' " and (2) " 'to address a complaint by landlords that proper rent levels are often difficult to establish and that any mistake may subject the owner to severe penalties' "].)

The act provides that a residential landlord "who is in substantial compliance" with a local rent control ordinance as described in the statute "shall not be assessed a penalty or any other sanction for noncompliance with the ordinance ...." (Civ. Code, § 1947.7, subd. (b).) The statutory definition of "substantial compliance" includes a residential landlord who "has made a good faith attempt to comply with the ordinance ... but is not in full compliance, and has, after receiving notice of a deficiency from the local agency, cured the defect in a timely manner, as reasonably determined by the local agency." (*Ibid.*) The term " 'local agency' ... means the public entity responsible for the implementation of the ordinance ...." (*Ibid.*)

According to defendants, the trial court lacks authority to award civil penalties for rent control violations until the administrative procedure envisioned by the Petris Act takes place. That procedure requires notice of deficiency by the designated local agency, determination of compliance by that agency, and an opportunity to cure. (See Civ. Code, § 1947.7, subd. (b).) Because plaintiff failed to exhaust this administrative remedy, defendants contend, "the trial court was without jurisdiction to award sanctions or penalties" against them.

Plaintiff disagrees. First, plaintiff argues, the act does not create an administrative procedure. Furthermore, according to plaintiff, defendants were never in "substantial compliance" with the Ordinance, as required under the Petris Act. Lastly, plaintiff asserts, even assuming defendants were entitled to an administrative process by the act, the trial court nevertheless had jurisdiction to award civil penalties.

We first question whether the Petris Act even applies to the Ordinance at issue here. For one thing, as noted above, language in the act itself strongly suggests its limitation only to those jurisdictions where registration of rents is required. (Civ. Code, §§ 1947.7, subds. (b), (c), (e), (g), 1947.8, subd. (a).) That suggestion is borne out by legislative history materials concerning the

Petris Act, as furnished by the Legislative Intent Service.[13] Although the Ordinance requires the payment of annual "rent-dispute" fees, it contains no registration requirement of the type apparently contemplated by the Petris Act. For another thing, apart from the registration issue, we wonder whether the act was intended to apply to mobilehome parks rent schemes at all. The act's legislative history suggests that it was not meant to govern mobilehome rent control ordinances.[14]

In any event, even assuming the Petris Act applies to disputes arising under the Ordinance, nothing in the act either creates an administrative procedure or mandates its exhaustion as a precondition to judicial intervention. As defendants themselves acknowledge, the statute "does not require a regulating agency to adopt such a procedure, nor does [Civil Code section] 1947.7 create such a procedure." Rather, defendants argue, the statute "does *prohibit* the award of sanctions or penalties if such a procedure is not adopted *and* followed."

### 4. *Exhaustion and Primary Jurisdiction*

To assess defendants' argument that plaintiff's resort to judicial action impermissibly bypassed "procedural and jurisdictional protections," we must consider and apply two related doctrines of administrative law: exhaustion and primary jurisdiction.

" ' "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone: judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial

---

[13] For example, the files of Senator Nicholas Petris, the author of the legislation (Sen. Bill No. 2580), include a note dated August 28, 1986 entitled Amendments to Senate Bill 2580. That note states: "The amendments on the Assembly side removed opposition." One of the two cited Assembly amendments "specified that the bill only affected rent control districts that require registration of rents." (Underscoring in original.) The Senate concurred in the Assembly amendments on August 28, 1986. (Sen. Bill No. 2580, Sen. concurrence in Assem. Amends., Sen. Final Hist. (1985–1986 Reg. Sess.) p. 1614.)

[14] The bill author's file, as furnished by the Legislative Intent Service, includes a copy of an Analysis by the Senate Committee on the Judiciary of the bill (Sen. Bill No. 2580) as amended May 1, 1986. The analysis notes the bill's application to mobilehome parks and further notes opposition by the Golden State Mobilehome Owners League, Inc. Next to the numbered paragraph stating that the provisions of the bill are applicable to mobilehome parks is the handwritten notation "amend them out." (See, e.g., *Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 219 [185 Cal.Rptr. 270, 649 P.2d 912] [court discussed undated memo from file of legislation's author].)

process is suspended pending referral of such issues to the administrative body for its views.' " (*United States v. Western Pac. R. Co.* (1956) 352 U.S. 59, 63–64 [1 L.Ed.2d 126, 77 S.Ct. 161, 135 Ct.Cl. 997], quoted in *Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 390.) The primary jurisdiction doctrine is sometimes called the "prior resort" or the "preliminary jurisdiction" doctrine. (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 386.)

As our state's high court has observed, "courts have often confused the two closely related concepts ...." (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 390.) " 'Both are essentially doctrines of comity between courts and agencies. They are two sides of the timing coin: Each determines whether an action may be brought in a court or whether an agency proceeding, or further agency proceeding, is necessary.' [¶] ... 'Exhaustion applies where an agency alone has exclusive jurisdiction over a case; primary jurisdiction where both a court and an agency have the legal capacity to deal with the matter.' " (*Id.* at pp. 390–391, quoting Schwartz, Administrative Law (1984) § 8.23, pp. 485, 486.)

"The policy reasons behind the two doctrines are similar and overlapping. The exhaustion doctrine is principally grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary). [Citations.] ... [T]he primary jurisdiction doctrine advances two related policies: it enhances court decisionmaking and efficiency by allowing courts to take advantage of administrative expertise, and it helps assure uniform application of regulatory laws. [Citations.]" (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 391.)

### 5. *Application*

In this case, the governing principle is primary jurisdiction, not exhaustion. (See *Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 390.)

This is not a case where plaintiff bypassed an available administrative procedure. No such procedure existed. ▮▮▮ In the absence of an available administrative remedy, the exhaustion doctrine does not apply. (Cf., *Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 391 [as to count 1 of the People's complaint, exhaustion doctrine would have applied, since the statute provided for an administrative proceeding; by contrast, as to count 2 of the complaint, there was no exhaustion issue, because no administrative procedure was available as to that count].)

Nor do we agree with defendants that the Petris Act requires the local agency to adopt and use such a procedure as a precondition to the imposition

of statutory civil penalties for unfair business practices. "Because it sweeps so broadly, the Unfair Practices Act applies to many situations in which no administrative process is available to address the challenged practice." (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 395.)

In this case, plaintiff's claim that defendants violated the unfair practices law "is 'originally cognizable in the courts,' and thus it triggers application of the primary jurisdiction doctrine." (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 391.) ▮ In applying the doctrine, a threshold question is whether the trial court has discretion to stay the judicial action pending an administrative determination. (*Id.* at p. 394.) If the particular legislative scheme *forecloses* judicial discretion under the doctrine, the court *must* adjudicate the action before it. (*Ibid.*) Otherwise, the court has discretion either to hear the action or to stay it until "available administrative processes" are first "invoked and completed." (*Ibid.*)

Here, the trial properly exercised its discretion to adjudicate the action before it. "No rigid formula exists for applying the primary jurisdiction doctrine [citation]." (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 391, citing *United States v. Western Pac. R. Co., supra,* 352 U.S. at p. 64.) "Instead, resolution generally hinges on a court's determination of the extent to which the policies noted above are implicated in a given case. [Citations.]" (*Ibid.*) Those policies—efficiency and uniformity—would not have been served in this case by staying the judicial action in favor of administrative action.

The critical issue here was whether the dealer leases were exempt. To resolve that issue, the trial judge was required to construe the Ordinance, an inherently judicial function. "[C]ourts are the ultimate arbiters of the construction of a statute. [Citation.] An administrative agency cannot alter or enlarge the legislation, and an erroneous administrative construction does not govern the court's interpretation of the statute. [Citation.]" (*Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 526 [63 Cal.Rptr.2d 118].) This case turns on "a question of statutory interpretation, a matter with which courts have considerable experience and which does not necessitate deferral to another agency. [Citation.]" (*Id.* at p. 529.) In this case, neither efficiency nor uniformity would be enhanced by "administrative expertise." (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 391; cf., e.g., *Mathew Zaheri Corp. v. Mitsubishi Motor Sales* (1993) 17 Cal.App.4th 288, 293 [21 Cal.Rptr.2d 325] [exhaustion of administrative remedy not required where "the agency possesses no greater expertise to consider the controversy than a judicial forum"].) The trial court thus acted properly in deciding the matter in the first instance.

Nor do we perceive any inherent unfairness in requiring defendants to answer in a judicial forum in the first instance, notwithstanding their claim that they should have been given notice of violation and an opportunity to cure before the imposition of penalties. "A landlord who has ignored the dictates of state and local law cannot legitimately argue it has no notice of its wrongdoing until an administrative body or court rules on the issue." (*Village Trailer Park, Inc. v. Santa Monica Rent Control Bd., supra,* 101 Cal.App.4th at p. 1145 [rejecting landlord's due process claim].)

To sum up, we conclude that the trial court was authorized to adjudicate the statutory violations in the first instance.

### B. *Amount*

Each violation of the unfair practices law and each violation of the false advertising law is punishable by a civil penalty in the maximum amount of $2,500. (Bus. & Prof. Code, §§ 17206, subd. (a) [unfair practices law], 17536, subd. (a) [false advertising law].) In this case, the court found more than 14,000 separate statutory violations; it assessed civil penalties totaling $525,000 against defendants. Defendants contend that the trial court miscalculated the number of violations and that the penalties it assessed are excessive.

#### 1. *Standard of Review*

The statute "requires a court to impose a penalty for each unlawful business practice committed." (*Hewlett v. Squaw Valley Ski Corp., supra,* 54 Cal.App.4th at p. 537; see Bus. & Prof. Code, § 17206, subd. (b) ["court shall impose a civil penalty for each violation of this chapter"], § 17536, subd. (b) [same]; see also, e.g., *People v. National Association of Realtors* (1984) 155 Cal.App.3d 578, 585 [202 Cal.Rptr. 243] ["the duty to impose a penalty for each violation ... is mandatory"].) "However, the amount of the penalty lies within the court's discretion. [Citation.]" (*Hewlett v. Squaw Valley Ski Corp., supra,* 54 Cal.App.4th at p. 537. Accord, *People v. Murrison* (2002) 101 Cal.App.4th 349, 365 [124 Cal.Rptr.2d 68].)

#### 2. *Number of Violations*

The amount of the penalty depends in the first instance on the number of violations committed. (*People v. Superior Court (Jayhill)* (1973) 9 Cal.3d 283, 288 [107 Cal.Rptr. 192, 507 P.2d 1400] (*Jayhill*).) It is up to the courts to "determine what constitutes a 'violation' ..." (*Ibid.*) "[Business and Professions Code] [s]ections 17206 and 17536

fail to specify what constitutes a single violation, leaving it to the courts to determine appropriate penalties on a case-by-case basis. [Citation.]" (*People v. Toomey* (1984) 157 Cal.App.3d 1, 22 [203 Cal.Rptr. 642].)

In this case, the trial court counted 14,124 statutory violations arising from two different patterns of conduct on defendants' part. The court first considered defendants' actions in obtaining the unlawful long-term leases. The court concluded that each time defendants forced a tenant to accept the conditions of a long-term dealer lease, they violated the unfair practices law. (Bus. & Prof. Code, § 17200.) The court found 154 violations on that basis. The court next addressed the defendants' monthly collections of rent. The court determined that each time defendants collected "above-Ordinance" rent under the long-term leases, they violated both the unfair practices law and the false advertising law. (Bus. & Prof. Code, §§ 17200, 17500.) By the court's calculation, defendants had unlawfully collected excess monthly rent approximately 6,985 times since January 1987. The court thus found 7,139 violations of Business and Professions Code section 17200 (6,985 unlawful rent collections plus 154 unlawful leases) and 6,985 violations of Business and Professions Code section 17500 (all unlawful rent collections), for a total of 14,124 separate statutory violations.

Defendants assign that calculation as error. They argue that appellate courts "have uniformly ruled that the number of violations is determined by the number of *people* affected, not the number of misrepresentations or (as in this case) number of monthly rent checks paid." Defendants thus urge that "the starting point should be the number of tenants/lessees." They observe that only "approximately 80 spaces in the mobilehome parks were governed by the dealer leases found in violation of the Ordinance."

In contending for a "per person" rather than a "per act" calculation, defendants rely on our high court's decision in *Jayhill*. (*Jayhill, supra,* 9 Cal.3d at p. 289.) In *Jayhill*, the defendants (door-to-door encyclopedia sellers) made at least 25 separate misrepresentations to each prospective purchaser. The Attorney General argued that each misrepresentation constituted a separate violation. The California Supreme Court disagreed, saying "we believe the Legislature intended that the number of violations is to be determined by the number of persons to whom the misrepresentations were made, and not the number of separately identifiable misrepresentations involved." (*Ibid.*) As we explain, defendants' reliance on *Jayhill* is misplaced in this case.

Certainly, in many cases, it will be proper to calculate violations "on a 'per victim' basis." (*People ex rel. Smith v. Parkmerced Co.* (1988) 198

Cal.App.3d 683, 692 [244 Cal.Rptr. 22], citing *Jayhill, supra,* 9 Cal.3d at p. 289, disapproved on another ground in *Kraus v. Trinity Management Services, Inc., supra,* 23 Cal.4th at pp. 128, 137; see also, e.g., *People v. Toomey, supra,* 157 Cal.App.3d at p. 23 [no error in calculating violations based on number of sales of misleading coupons]; *People v. Dollar Rent-A-Car Systems, Inc.* (1989) 211 Cal.App.3d 119, 132 [259 Cal.Rptr. 191] [no error in basing penalty on more than 500,000 misleading car rental contracts plus other conduct]; *People v. Morse* (1993) 21 Cal.App.4th 259, 273 [25 Cal.Rptr.2d 816] [no error in calculating violations based on number of people solicited by defendant-attorney for legal services].)

However, as a number of courts have recognized, "it is unlikely that *Jayhill* intended to establish a test for determining the number of violations applicable to all situations." (*People v. Superior Court (Olson)* (1979) 96 Cal.App.3d 181, 197 [157 Cal.Rptr. 628], citing *People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 923 [132 Cal.Rptr. 767].) ▮ Instead, determining what qualifies as a single violation "depends on the type of violation involved, the number of victims and the repetition of the conduct constituting the violation—in brief, the circumstances of the case." (*People v. Witzerman* (1972) 29 Cal.App.3d 169, 180 [105 Cal.Rptr. 284]; see also, e.g., *People v. Superior Court (Olson), supra,* 96 Cal.App.3d at p. 198 [in the context of a misleading newspaper advertisement, a reasonable interpretation would be that "a single publication constitutes a minimum of one violation with as many additional violations as there are persons who read the advertisement or who responded to the advertisement"]; *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 535 [206 Cal.Rptr. 164] [in the context of nursing home violations, it was reasonable both to aggregate "certain multiple species of violations into a single 'act' " and to punish "certain single egregious acts or conditions"].)

▮ In light of these authorities, we reject defendants' contention that the number of violations must always be calculated on a "per victim" rather than a "per act" basis. To the contrary, in a proper case, "a *single* act in violation of regulations may constitute an unlawful business practice—a *'violation'* for which a penalty of up to $2,500 may be imposed. [Citations.]" (*People v. Casa Blanca Convalescent Homes, Inc., supra,* 159 Cal.App.3d at p. 534, disapproved on another ground in *Cel-Tech Communications v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 184–185 [83 Cal.Rptr.2d 548, 973 P.2d 527]; see also, e.g., *People v. National Association of Realtors, supra,* 155 Cal.App.3d at p. 585 [each act may be subject to separate punishment].)

Given the circumstances of this case, the trial court did not err in calculating the number of statutory violations based on defendants' actions as

well as the number of affected tenants. First, each unlawful act was a separate, discrete event. Each long-term dealer lease violated the Ordinance. (§ 370.) Each collection of unauthorized rent violated the Ordinance. (§§ 17.22.2020, 17.22.2030.) Furthermore, each unlawful act—including the collection of excess rent each month—was designed to enrich defendants at the expense of the affected tenants. The trial court's method of calculating violations thus is "reasonably related to the gain or the opportunity for gain achieved by" defendants' unlawful scheme. (*People v. Superior Court (Olson)*, *supra*, 96 Cal.App.3d at p. 198; accord, *People v. National Association of Realtors*, *supra*, 155 Cal.App.3d at p. 586.) Finally, the trial court's method of counting each individual unlawful act as a separate violation properly takes into account the nature and extent of the public injury that defendants inflicted in this case. (*People v. Superior Court (Olson)*, *supra*, 96 Cal.App.3d at p. 198; *People v. National Association of Realtors*, *supra*, 155 Cal.App.3d at p. 586.) For these reasons, the trial court was fully justified in counting each of defendants' discrete unlawful acts as a separate statutory violation.

### 3. *Amount of Penalty*

Having determined that defendants were guilty of more than 14,000 statutory violations, the court proceeded to assess civil penalties totaling $525,000. In setting the amount, the court expressly considered the relevant statutory factors.

The statutes direct: "In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." (Bus. & Prof. Code, § 17206, subd. (b) [unfair practices law]; see also, § 17536, subd. (b) [false advertising law; identical language].)

Applying those factors, the trial court observed that defendants violated the Ordinance for 13 years, that they knew or should have known that they were violating the Ordinance, that they collected an estimated $75 million in rents over that time, and that an undetermined but substantial number of tenants had been forced from their homes as a result of defendants' unlawful practices. However, the court's assessment was "tempered" by its finding that defendants' conduct was not unfair or fraudulent but merely unlawful.

The court set the penalty at $525,000, which it identified as the approximate amount of excess rent defendants had collected over the relevant time

period. In doing so, the court noted that the maximum penalty authorized by the statutes would exceed $35 million (14,124 violations at $2,500 per violation). However, the court recognized, "such a penalty would be so disproportionate to the illicit gains obtained by defendants as to constitute an excessive fine." (See, e.g., *Hale v. Morgan* (1978) 22 Cal.3d 388, 399 [149 Cal.Rptr. 375, 584 P.2d 512].) The court then discussed a "more reasonable range of penalties" as "suggested by the Ordinance and relevant case law" under the statutes. The court noted that the Ordinance permits treble damages to private litigants, but it chose to assess a lower penalty in light of its determination that defendants' conduct was only unlawful, not unfair or fraudulent. The court explicitly set the penalty without assigning a specific dollar amount for each violation. It divided the penalty between the two defendants based on the number of affected tenants who rented space in each park.

Defendants attack the penalty as excessive. They argue that the reported decisions illustrate why the penalty in this case "should be minimal."

We find no merit in that argument. In our view, the penalty imposed in this case is minimal considering the number of violations, the continuing nature of defendants' conduct, and the resulting injury to tenants. The penalty assessed here averages approximately $37 per violation ($525,000 divided by 14,124 violations). That amount is "reasonable, if not lenient" "given the great number of victims, the economic benefit to appellant from the marketing scheme, and the continuing nature of the unlawful business practices." (*People v. Toomey, supra,* 157 Cal.App.3d at p. 23 [upholding penalty of $150,000]; see also, *Hewlett v. Squaw Valley Ski Corp., supra,* 54 Cal.App.4th at p. 537 [upholding penalty of $223,000, which the court deemed "modest in light of [defendant's] egregious behavior"]; *People v. Dollar Rent-A-Car Systems, Inc., supra,* 211 Cal.App.3d at p. 132 [under the circumstances, "$100,000 civil penalty was abundantly justified"].) Higher per-violation penalties have been affirmed in many cases. (See, e.g., *People ex rel. Van de Kamp v. Cappuccio, Inc.* (1988) 204 Cal.App.3d 750, 765 [251 Cal.Rptr. 657] [592 violations based on underweight squid; $124.20 per violation]; *People ex rel. Smith v. Parkmerced Co., supra,* 198 Cal.App.3d at p. 692 [4,259 tenants charged illegal fees; $50 per violation]; *People v. Bestline Products, Inc., supra,* 61 Cal.App.3d at p. 923 [3,000 prospective distributors misled; approximately $330 per violation]; *People v. Casa Blanca Convalescent Homes, Inc., supra,* 159 Cal.App.3d at p. 535 [$167,500 in penalties for 67 violations "more than fair and reasonable"].) ██ If anything, the published decisions teach that the trial court's discretion in setting civil penalties generally will be upheld. In fact, we are aware of only two reported appellate decisions faulting the trial court's civil penalty decision. In one, the matter was remanded because the trial court set the number of violations too low. (*People v. Superior Court (Olson), supra,* 96

Cal.App.3d at p. 198 [the trial court erred in concluding that "dissemination of a false or deceptive advertisement through a single edition of a newspaper can constitute but one violation of each statute as a matter of law"].) In the other, the appellate court reversed because the trial court imposed no penalty despite finding of a violation. (*People v. National Association of Realtors, supra,* 155 Cal.App.3d at p. 585 ["the duty to impose a penalty for each violation [] is mandatory …. Therefore, the court abused its discretion in not imposing any penalty"].)

In assessing a civil penalty for unfair business practices, "the trial court must manifestly act reasonably in light of all pertinent factors …." (*People v. Superior Court (Olson), supra,* 96 Cal.App.3d at p. 198.) The court certainly did so in this case. Its approach was thorough, considered, and measured. The resulting penalty was reasonable and the trial court acted well within its discretion in imposing it.

## III. *Restitution*

In addition to the civil penalties it imposed, the court ordered defendants to pay restitution to tenants affected by defendants' violations of the Ordinance. The court ordered restitution of all "above-Ordinance" rents charged to tenants in unlawful long-term leases, plus prejudgment interest on those amounts. The court also ordered defendants to pay restitution to certain tenants for the diminution in value of their leasehold interests resulting from defendants' unlawful business practices.

Defendants challenge the restitution order on two related grounds. First, defendants claim, the court erred as a matter of law in "partially rescinding" the unlawful long-term leases. They argue that the court was required to rescind the leases in their entirety. Furthermore, according to defendants, the court employed an erroneous restitution formula, which failed to restore the parties to the status quo ante and which was premised on an unconstitutional rent control scheme.

### A. *Rescission*

The first prong of defendants' attack on the trial court's remedy is based on their rescission claim. According to defendants: "Because the leases were found to be illegal, the leases must be wholly rescinded and the parties placed back in their original bargaining positions."

Defendants' argument is without merit. It both misapprehends the trial court's order in this case and confuses the remedies available for different civil wrongs.

The trial court did not rescind the leases—either wholly or partially. As the court correctly observed, "there is no reason to rescind the leases, even solely for purposes of calculating restitution. Plaintiff's suit is based on violations of the Ordinance and, by extension, [section] 17200. It is based on statute, not on contract."

The trial court thus properly distinguished rescission from restitution. ■ The two remedies are distinct. (*Gardiner Solder Co. v. SupAlloy Corp., Inc.* (1991) 232 Cal.App.3d 1537, 1544 [284 Cal.Rptr. 206].)

■ Simply put, rescission stands as a contract remedy. (See, e.g., Civ. Code, §§ 1691 [procedure for rescinding contract], 1692 [relief available after contract rescission].) Rescission is generally understood to mean the "unmaking of a contract." (Black's Law Dict. (7th ed. 1999) p. 1308, col. 1 [defining "rescission"].) "The remedy of rescission necessarily involves a repudiation of the contract." (*Lobdell v. Miller* (1952) 114 Cal.App.2d 328, 343 [250 P.2d 357]; see generally *Runyan v. Pacific Air Industries, Inc.* (1970) 2 Cal.3d 304, 311–318 [85 Cal.Rptr. 138, 466 P.2d 682] [discussing the development of the law of rescission].) Within the confines of contract law, rescission is a broad remedy. "It is essential to recognize that rescission is a commodious remedy available to redress various wrongs each of which, generically, is sharply distinguishable from the others. Rescission by agreement, for instance, is contractual in nature .... Rescission for illegality, finally, is a remedy which enables a party, in the circumstances specified, to procure restitutionary relief with respect to a contract which was never enforceable." (Recommendation: A Study Relating to Rescission of Contracts (Oct. 1960) 3 Cal. Law Revision Com. Rep. (1961) p. D-15, fn. 1.)

■ In an appropriate contract action, rescission may be followed by restitution. (Civ. Code, § 1692 [after rescission of a contract, the aggrieved party "shall be awarded complete relief, including restitution of benefits"]; *Runyan v. Pacific Air Industries, Inc., supra,* 2 Cal.3d. at p. 311.) Here, for example, the affected tenants presumably could have sued to rescind the leases on the ground of illegality and to recover restitutionary damages. Instead, the People of the State of California brought this action to establish statutory violations.

■ In a statutory action such as this one, rescission is not a necessary predicate to granting restitution. (Cf., e.g., *Parkmerced Co., supra,* 198 Cal.App.3d at p. 692 [tenants entitled to restitution for UCL violation; no indication that leases were rescinded]; *Epstein v. Frank* (1981) 125 Cal.App.3d 111, 122–123 [177 Cal.Rptr. 831] [despite usurious interest rate, promissory note not rescinded]; *Elmers v. Shapiro* (1949) 91 Cal.App.2d 741,

747, 750, 756 [205 P.2d 1052] [seller who violated price control statute was liable for restitution of overcharge even though buyer never offered to rescind].)

■ To sum up, the rescission remedy typically applies only in contract actions. This is not a contract action. The trial court therefore acted properly in declining to rescind the illegal leases in whole or in part.

### B. *Restitution*

Defendants next challenge the restitution formula employed by the trial court.

First, defendants contend, the restitution order is flawed because it fails to accomplish the fundamental object of restitution, which is "to place the parties in the same position they would have been in before the challenged contract was entered into."

As with their rescission argument, defendants' restitution argument fails to differentiate between contractual and statutory remedies. ■ As explained above, restitution may be awarded in contract actions. But it is also available as a remedy to redress statutory violations. " ' "Restitution" is an ambiguous term, sometimes referring to the disgorging of something which has been taken and at times referring to compensation for injury done.' " (Calamari & Perillo, The Law of Contracts (3d ed. 1987) § 9-23, p. 376, quoted in Black's Law Dict., *supra*, p. 1315, col. 2 [defining "restitution"]; see generally Rest., Restitution, Introductory Note, pp. 595–596; Rest., Contracts, § 347, com. b., p. 113.)

■ In a suit for violation of the unfair competition law, "orders for restitution" are those "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken ...." (*Kraus v. Trinity Management Services, Inc., supra,* 23 Cal.4th at pp. 126–127.) Such restitutionary relief is explicitly authorized by statute. "The court may make such orders or judgments ... as may be necessary to restore to any person in interest any money or property ... acquired by means of such unfair competition." (Bus. & Prof. Code, § 17203.)

■ Where restitution is ordered as a means of redressing a statutory violation, the courts are not concerned with restoring the violator to the status quo ante. The focus instead is on the victim. "The status quo ante to be achieved by the restitution order was to again place the *victim* in possession of that money." (*Cortez v. Purolator Air Filtration Products Co., supra,* 23

Cal.4th at p. 177, italics added [UCL violation].) "The object of [statutory] restitution is to restore the status quo by returning to the *plaintiff* funds in which he or she has an ownership interest." (*Korea Supply Co. v. Lockheed Martin Corp., supra,* 29 Cal.4th at p. 1149, italics added [UCL violation].) "The purpose of the civil remedy is to allow recovery of the excess paid and to prohibit the seller from receiving and keeping such excess." (*Elmers v. Shapiro, supra,* 91 Cal.App.2d at p. 752 [price control violation].) Moreover, in contrast to contract restitution, statutory restitution is not solely "intended to benefit the [victims] by the return of money, but instead is designed to penalize a defendant for past unlawful conduct and thereby deter future violations. [Citations.]" (*People v. Toomey, supra,* 157 Cal.App.3d at pp. 25–26 [UCL violations].)

In this case, the trial court required defendants to disgorge unauthorized rents and to restore that money to the affected tenants. As the court explained, it made that order "to avoid unjustly enriching defendants and to compensate tenants who paid above–Ordinance rents." Quite properly, the court also recognized the deterrent value of the order. "The purpose of such orders is 'to deter future violations of the unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains.' [Citations.]" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545], quoting *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, 449 [153 Cal.Rptr. 28, 591 P.2d 51], and also citing *Jayhill, supra,* 9 Cal.3d at pp. 288–289 & fn. 3.)

As our high court recently confirmed, the trial court's discretion to award restitution under the UCL is very broad. (*Cortez v. Purolator Air Filtration Products Co., supra,* 23 Cal.4th at p. 180.) There was no abuse of that discretion in this case. The trial court's carefully crafted restitution remedy is based on appropriate factors, and it accomplishes the statutory objective of restoring to the victims sums acquired through defendants' unfair practices. The trial court was not required to place defendants in the status quo ante. The order for restitution in this case is proper under the unfair competition law.

Defendants nevertheless argue that the restitution order should be set aside on another ground. As defendants put it: "An additional reason for employing a market rent as the initial rent, quite apart from restoring the status quo ante, is that vacancy control is unconstitutional. Courts sitting in equity should refrain from imposing unconstitutional measures in fashioning restitution." In support of their argument, defendants cite *Richardson v. City and County of Honolulu* (9th Cir. 1997) 124 F.3d 1150 (*Richardson*).

The trial court rejected that argument below on several grounds. Among other things, the trial judge recognized that California courts have declined to

follow *Richardson*. (See, e.g., *Montclair Parkowners Assn. v. City of Montclair, supra*, 76 Cal.App.4th at p. 795; see also, e.g., *Sandpiper Mobile Village v. City of Carpinteria* (1992) 10 Cal.App.4th 542, 550 [12 Cal.Rptr.2d 623] [California courts have upheld vacancy control as legitimate economic regulation].) As a procedural matter, the court also observed that defendants failed to raise their *Richardson* claim in this proceeding, although it was raised in the bifurcated cross-complaint. In light of the court's procedural finding, we will defer addressing the merits of defendants' *Richardson* claim here. We will address that claim if and as necessary to our resolution of the appeal in the bifurcated proceeding.

In sum, neither of the grounds advanced by defendants in their challenge to the restitution order compels its reversal. The trial court did not err in fashioning its restitution remedy.

## IV. *Statute of Limitations*

Defendants' final contention relates to the trial court's determination that the statute of limitations had not run with respect to early violations.

The statute of limitations on the statutory claims is four years. (Bus. & Prof. Code, § 17208.) Plaintiff brought this action in December 1995. The trial court nevertheless imposed liability on defendants for statutory violations committed as early as January 1987. The court did so based on its finding that defendants conspired with the dealers to violate the Ordinance and the statute. The court explained: "The statute of limitations does not begin to run on wrongful acts committed pursuant to a civil conspiracy until completion of the last overt act of that conspiracy. [Citation.] ... Therefore, the statute of limitations has not begun to run on defendants' violations of [Business and Professions Code section] 17200 because defendants are still enforcing their unlawful long-term leases."

Defendants assert that the trial court erred in finding a civil conspiracy, because it ignored the requirement of knowledge of the wrongfulness of the acts.

### A. *Conspiracy: General Principles*

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.]" (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510–511 [28 Cal.Rptr.2d 475, 869 P.2d 454].)

 Liability for civil conspiracy generally requires three elements: (1) formation of the conspiracy (an agreement to commit wrongful acts); (2) operation of the conspiracy (commission of the wrongful acts); and (3) damage resulting from operation of the conspiracy. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra,* 7 Cal.4th at p. 511; *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581 [47 Cal.Rptr.2d 752].)

In addition to those three elements, it has been said that participants in a conspiracy also must know that their conduct is wrongful. As our high court has stated, one harmed by a conspiracy "is entitled to damages from those defendants who concurred in the tortious scheme with knowledge of its unlawful purpose." (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 784 [157 Cal.Rptr. 392, 598 P.2d 45]; see also, e.g., *Kidron v. Movie Acquisition Corp., supra,* 40 Cal.App.4th at p. 1582 [conspiring defendants must have actual knowledge of the wrongful nature of the scheme].) However, to the extent that knowledge of the scheme's unlawful purpose is required, it may be inferred from the surrounding circumstances, including the nature of the acts done, the relation of the parties, and the interests of the defendants. (*Wyatt v. Union Mortgage Co., supra,* 24 Cal.3d at p. 785. Cf., *People v. Tierney* (1967) 253 Cal.App.2d 1, 5–6 [61 Cal.Rptr. 164] [in criminal indictment for conspiracy to violate false advertising and other laws, the evidence "warrants the inference that all respondents knew that what they were doing was wrong"].)

### B. *Effect on Limitations Period*

 Proof of a civil conspiracy triggers the "last overt act" doctrine. (*Wyatt v. Union Mortgage Co., supra,* 24 Cal.3d at p. 786.) Under that doctrine, the statute of limitations does not begin to run until the final act in furtherance of the conspiracy has been committed. (*Ibid.* [statute did not begin to run until defendant's collection of the final loan payment shortly before trial].)

### C. *Application*

#### 1. *Knowledge*

Here, the trial court rejected defendants' contention that knowledge of wrongfulness was required to support the finding of a civil conspiracy. Noting that the statutory violation is a strict liability offense, the court concluded: "There is no need to prove that the parties knew that the act was illegal."

Assuming (without deciding) that that conclusion was erroneous, the record nevertheless contains sufficient evidence from which such knowledge

of the scheme's unlawfulness may be inferred. (See, e.g., *Wyatt v. Union Mortgage Co., supra,* 24 Cal.3d at p. 785.) Thus, for example, there was testimony that defendants used the long-term dealer leases to avoid rent control. There was also testimony that the dealers and defendants' employees even signed such leases retroactively. The record also demonstrates that the economic interests of the defendants were served by the scheme. In short, under all the circumstances, defendants' knowledge of the unlawfulness of their actions may be inferred. (*Ibid.*)

### 2. *Accrual of the statute of limitations*

The evidence provides adequate support for the trial court's finding of a civil conspiracy. Each month's collection of excess rent constitutes an overt act in furtherance of that conspiracy. (Cf., e.g., *Wyatt v. Union Mortgage Co., supra,* 24 Cal.3d at p. 786 [collection of each loan payment].) Defendants were still collecting unlawful rent right up through the trial of this case. Thus, when the trial court issued its statement of decision, defendants had not yet committed the last overt act of their conspiracy and the statute of limitations had not yet accrued. (*Ibid.*)

Under these circumstances, the trial court acted properly in imposing statutory liability for actions occurring as early as January 1987.

## CONCLUSION

We find no merit in any of defendants' contentions. Our conclusions as to each may be summarized as follows:

I. As properly construed, the Ordinance requires actual and personal residency in a mobilehome as a predicate to exemption from rent control. The dealer leases failed to meet the residency requirement. The court thus correctly determined that the dealer leases violate the Ordinance.

II. Notwithstanding the Petris Act, the trial court was authorized to adjudicate the statutory violations and to impose civil penalties in the first instance. The court did not err in calculating the number of statutory violations, nor was the resulting penalty excessive in amount.

III. The trial court was not required to rescind the leases as a predicate to its statutory restitution remedy. Its restitution formula properly considered the circumstances of the case.

IV. Given the evidence of a civil conspiracy, the trial court acted properly in rejecting defendants' statute of limitations defense.

## DISPOSITION

The judgment is affirmed. Plaintiff shall have costs on appeal.

Premo, Acting P. J., and Elia, J., concurred.

A petition for a rehearing was denied September 9, 2003, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied November 25, 2003. Brown, J., did not participate therein.