Filed 1/5/24  Pacific Manufactured Homes v. M. A. Cirillo & Associates CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PACIFIC MANUFACTURED HOMES et al., | D080931 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2018-00047554-CU-OR-NC) |
| M.A. CIRILLO & ASSOCIATES et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Affirmed.

Gordon Rees Scully Mansukhani and Christopher B. Queally, for Defendants and Appellants.

Winet Patrick Gayer Creighton & Hanes and Randall L. Winet, for Plaintiffs and Respondents.

After concluding at trial that a mobilehome park management company had violated laws intended to protect tenants and prospective tenants, the trial court issued a judgment enjoining the company from engaging in certain business practices.  The company concedes it violated the law, but argues that imposition of an injunction was error because the evidence did not

support an inference that, at the time of trial, its unlawful conduct was ongoing or likely to recur.  We disagree.  Hence we affirm.

# I.

# BACKGROUND

## A.  *Mobilehomes, Mobilehome Parks and the Mobilehome Residency Law*

To supply context for this appeal, we begin with a brief introduction to the topic of mobilehomes, mobilehome parks and mobilehome park regulation in California, commencing with an observation that the term "mobilehome" is a misnomer:

> "The term 'mobile home' is somewhat misleading.  Mobile homes are largely *im*mobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself.  They are generally placed *permanently* in parks; [and,] once in place, only about 1 in every 100 mobile homes is ever moved."

(*Yee v. City of Escondido* (1992) 503 U.S. 519, 523, italics added (*Yee*); see also *People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 109 (*Kennedy*).)

"Ordinarily, mobilehome park tenants own their homes but rent the spaces they occupy."  (*Kennedy, supra,* 111 Cal.App.4th at p. 109; see also *Yee, supra,* 503 U.S. at p. 523.).)  Whereas the "park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities" (*Yee,* at p. 523), the "mobile home owner often invests in site-specific improvements such as a driveway, steps, walkways, porches, or landscaping."  (*Ibid*.)  "Rents paid by mobilehome residents cover park amenities, park common areas, and maintenance of in-park infrastructure like roads and fences, and, in addition to rents, residents are still responsible for making other payments just like other homeowners,

2

including paying mortgages and taxes, as well as making payments for repairs and maintenance." (Stats. 2021, ch. 125 (Assem. Bill No. 978), § 1(h) adding Civ. Code § 798.30.5.) "When the mobile home owner wishes to move, the mobile home is usually sold in place, and the purchaser continues to rent the pad on which the mobile home is located." (*Yee, supra,* 503 U.S. at p. 523.)

"In California, mobilehome tenancies are governed by the Mobilehome Residency Law" (*Kennedy, supra,* 111 Cal.App.4th at p. 109), a body of legislation originally enacted in 1978 (*Yee, supra,* 503 U.S. at p. 523) that is codified at Civil Code section 798 et seq.[1] and commonly known as the MRL. This body of law has been described as "extensively regulat[ing] the landlord-tenant relationship between mobilehome park owners and residents" in the state. (*Greening v. Johnson* (1997) 53 Cal.App.4th 1223, 1226.)

As our colleagues in the Sixth District have noted, "the singular nature of mobilehome tenancies [renders] mobilehome park tenants . . . particularly vulnerable . . . to eviction." (*Kennedy, supra,* 111 Cal.App.4th at p. 109.) Thus a chief purpose of the MRL, and a public policy of the state of California, is to "protect[] mobilehome owners against arbitrary evictions." (*Ibid.*) "The Legislature finds and declares that . . . it is necessary that the owners of mobilehomes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the [MRL]." (§ 798.55(a).)

Among the ways in which the MRL achieves the Legislature's objective of furnishing protection to mobilehome owners in the eviction context is by prohibiting mobilehome park managers from: evicting a mobilehome owner

---

[1]    Unless stated otherwise, all further statutory references are to the Civil Code.

3

on less than 60 days notice (§ 798.55, subd. (b)(1)); evicting a mobilehome owner without disclosing to them "the date, place, witnesses, and circumstances concerning [the] reason" for the eviction (§ 798.57); evicting a mobilehome owner for the purpose of making the site occupied by that owner's mobilehome available to the park owner or its agent so that *they* can sell or rent a mobilehome on that site to somebody else (§ 798.58, italics added); or evicting a mobilehome owner for any number of other purposes that are not among those set forth on a list of approved purposes set forth in the MRL.  (§§ 798.56, 798.58.)[2])

In addition to protections such as these that apply in the eviction context, the MRL also protects a mobilehome owner and a prospective purchaser when the owner is attempting to *sell* their mobilehome and the prospective purchaser is applying to be a resident in the mobilehome park in which the mobilehome is situated.  In a situation such as this, the MRL mandates that the manager of the park is prohibited from:  taking more than 15 days to accept or reject the prospective purchaser's residency application (§ 798.74, subd. (e)(1)); rejecting the prospective purchaser as a tenant other than for one or more of three specific reasons, delineated in the Civil Code, that pertain to non-compliance with park rules and regulations, insufficient finances, or dishonesty in the application process (*id.,* subd. (c)); failing to

___

[2]    The reasons for termination that are contained in section 798.56 pertain generally to:  non-compliance with a local ordinance or state law or regulation relating to mobilehomes (§ 798.56, subd. (a)); conduct that constitutes "a substantial annoyance" to other homeowners or residents (*id.,* subd. (b)); certain criminal conduct (*id.,* subd. (c)); non-compliance with park rules made a part of the rental agreement (*id.,* subd. (d)); non-payment of rent, utility charges, or reasonable incidental service charges (*id.,* subd (e)); condemnation of the park (*id.,* subd. (f)); and a change of use of part or all of the park (*id.,* subd. (g)).

4

disclose the reason why a prospective purchaser's residency application is being rejected (*id.,* subd. (e)(2)(A)); or, except in certain limited circumstances, requiring that the mobilehome be removed pending the sale. (§ 798.73.)

With these aspects of the MRL in mind, we now turn to the mobilehome park with which this case originated.

## B. *Lamplighter Park and Events Pertaining to Space 35*[3]

The mobilehome park with which this case originated is a 161-space, rent-controlled mobilehome community located in Oceanside and named B&B Lamplighter Mobilehome Park (Lamplighter Park). For most of the past 25 years, Lamplighter Park has been owned by B&B Lamplighter Oceanside Mobilehome Park, LLC (B&B) and managed by M. A. Cirillo & Associates dba Star Mobilehome Park Management (Star).

Among the park's tenants at the start of 2017 was Gerard Schultz. Schultz had been a tenant of the park, and his mobilehome had occupied space 35 in the park for 28 years. Later in 2017 Schultz moved to the state of Georgia and engaged a realtor to list his mobilehome for sale.

---

[3] As we note below, the standard of review we apply in this case is the abuse-of-discretion standard; however, in a case such as this, in which we are evaluating the factual basis for an exercise of discretion, the abuse-of-discretion standard is akin to the substantial-evidence standard that we apply when factual determinations are in issue. (See part II.A., *post*.) Hence, in reciting evidence in this opinion, we "accept as true all evidence tending to establish the correctness of the judgment, taking into account all inferences which might reasonably have been thought by the trial court to lead to the same conclusion," and we resolve "[e]very substantial conflict in the testimony . . . in favor of the judgment." (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 872.) " 'All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity, to be accepted by the trier of fact.' " (*Ibid.*).)

The realtor—Karina Giangreco—was experienced in the local market for mobilehome sales, having handled many mobilehome transactions in many mobilehome parks and having been the most active salesperson in Lamplighter Park during the previous five year period. In tackling the listing, Giangreco met with several prospects who expressed a desire to purchase the mobilehome from Schultz and to lease the space on which it sat (space 35) from B&B. Among these prospects were: Catherine and Gerald McCausland, who desired to leave the mobilehome on space 35 and make it their residence; and Lydia Miller, who desired that the mobilehome be removed and replaced with a *new* mobilehome, in which she could then reside on space 35. (Participants in the mobilehome park sales industry routinely use the term "pull-out" to refer to a mobilehome that is being replaced, or to the replacement process itself.)

As she was evaluating the different prospects, Giangreco was informed by an executive at Star that, if the mobilehome were purchased as a pull-out, then Star would not permit the purchaser to replace it with a new mobilehome on space 35. For this reason, she focused her initial efforts on the McCauslands. But these efforts foundered when Star insisted that the McCauslands undertake extensive repairs to the mobilehome, that they complete those repairs on a timetable that Giangreco perceived to be unrealistic, and that they take on that responsibility without a commitment from Star that it would ultimately accept them as tenants.

Based on the position Star was taking, coupled with previous challenges she had experienced in her dealings with Star, Giangreco concluded she could not in good conscience proceed with the McCauslands:

> "A. I had to let them know that, with [Star's conditions], I couldn't [in good conscience] let them move forward because of the experiences I'd had with Star. I couldn't see how

6

they'd even have the plot plans back and approved in the two months. And I was just worried that they'd be at risk of losing their entire investment.

"Q. You understood if they signed this that, if they didn't have everything done within two months, [then Star] had the option of basically telling them to . . . [remove the mobilehome from the park] and they would have no further rights?

"A. Correct.

"Q. And based upon your prior experience with Star, you advised the McCauslands, you can't go through with this?

"A. I did."

When the prospect of selling to the McCauslands ran aground, Giangreco reached back out to Star to ascertain whether it still was averse to a pull-out; and she received in response an e-mail from a Star executive stating (arguably inconsistent with Star's previous position) that: "A new home being installed would be in the park's best interest." Thus she shifted her efforts to selling to Miller.

In furtherance of these efforts, Giangreco prepared a purchase and sale agreement that Miller and Schultz each signed in February of 2018. Then Giangreco and Miller visited Sean Feeney of mobilehome dealer AAA American Pacific Manufactured Homes, dba Pacific Manufactured Homes (Pacific). Feeney agreed to sell Miller a new mobilehome and to help her accomplish the pull-out. Then Miller, Schultz, and Feeney entered escrow.

Shortly thereafter, in March, Giangreco helped Miller fill out a residency application. She then submitted the completed application to Star on Miller's behalf, and Star's resident manager at Lamplighter Park, Debbie Clark, acknowledged receipt. But, despite the MRL's requirement that a park manager respond within 15 days to a prospective purchaser's residency

7

application (see *ante*), some four months elapsed with no substantive response from Star. Then, in July, Giangreco and Feeney learned that Star was claiming it had never received the application. Thus Miller submitted a *second* residency application to Star.

That same month, a miscommunication associated with the four-month lapse in processing Miller's original residency application resulted in a missed rent payment and the issuance of a notice to Schultz to pay the rent within three days or else sell the mobilehome or remove it from the park within 60 days (the three-day notice). The three-day notice was noteworthy in at least two respects. First, according to Clark, the "rule of thumb is that you wait until the rent's overdue at least 30 days before you send out a three-day notice;" but in this instance Star did not wait. Second, the three-day notice was defective, because (the record is somewhat unclear on this point) it was either incorrectly addressed or never mailed.

Although Star contends "Schultz never responded to the three-day notice," this is not true. Rather, when Schultz became aware of the three-day notice (approximately one week after Star had posted it on the now-uninhabited mobilehome and possibly mailed it to an obsolete address), he attempted to make the payment electronically (from Georgia) but found that he had been "locked out of the system" Star uses to accept rent. When Feeney then drove to Lamplighter Park to make the payment on Schultz's *behalf*, his check was accepted by Clark—but then returned two days later accompanied by a letter that had been prepared at the behest of Star's president and sole shareholder, Mike Cirillo, stating that Star was "unable to accept payment from anyone other than the homeowner." (This statement was untrue, inasmuch as Star had a policy of *accepting* payment from non-owners and even had a form to be used for just that purpose.)

Then, on August 21, matters took a turn.  On that day, Star executive Maryann Tran acting at the direction of Mike Cirillo, prepared and mailed three letters, each addressed to a different participant in the Miller-Schultz-Pacific escrow.  To Schultz, she wrote:

> "It has been brought to our attention that you have sold your mobilehome located in space 35 to Pacific Manufactured Homes.  Your tenancy in the park is now terminated."

To Feeney (as Pacific) she wrote:

> "It is our understanding that you have completed the purchase of the mobilehome located on space 35 and attempted to tender rent for said space.
>
> "[¶] . . . [¶]
>
> "The management is hereby requiring you to remove the home from the park.  The park will relet the space as it sees fit."

And to Miller she wrote:

> "[Your] application for residency is denied . . . , as the purported seller listed on your application [Schultz] does not have any rights to the space."

In essence, Star was taking the position—notwithstanding the fact that escrow had not yet closed and thus title to the mobilehome had not yet conveyed to Pacific—that it (Star) was at liberty to treat (1) Schultz as though he were no longer vested in title, (2) space 35 as having reverted to the possession of Star, and (3) Miller's executory right to occupy space 35 as nothing more than the vestigial remains of a gutted promise.

On receiving the letter addressed to him, Feeney reached out to Star to discuss the matter.  But Star did not call him back.  Nor did Star or B&B relent in their position.  Instead, they doubled down.  That is, at a meeting the following month (September), the principals of B&B's ownership group

decided—on the recommendation of Mike Cirillo—"that we should hold the line and demand that Mr. Feeney remove the home."

Ultimately, Star took possession of the mobilehome, sold it at credit bid to B&B, replaced it (in space 35) with a new motorhome furnished by Star's mobilehome dealership affiliate, Star Mobilehome Sales (also owned by Mike Cirillo), and sold the new mobilehome to a third party to whom it leased space 35. Thus, rather than the mobilehome owned by Schultz being replaced with a new mobilehome to be sold to Miller in a transaction from which *Pacific* would earn a profit, it instead was replaced with a new mobilehome sold to some *other* new tenant in a transaction from which *Star and B&B* profited.

Meanwhile, in September of 2018, the day after Star and B&B had made the decision to "hold the line," Pacific and Miller filed this lawsuit against Star and B&B. In the lawsuit, Pacific and Miller requested damages and an injunction to prohibit Star and B&B from continuing to engage in the types of practices that had drawn out, obstructed, and ultimately torpedoed the sale to Miller.

C. *The Trial and Judgment*

The case went to trial before a jury in April of 2022. At trial, the jury heard from twelve witnesses, including: Miller, Feeney, Giangreco, Schultz, (via excerpts from his deposition), Tran, Clark, Mike Cirillo, the principals of the B&B ownership group, an escrow officer (who testified as both a percipient witness and an expert witness), and two defense experts. In his closing argument, counsel for Star and B&B methodically walked the jury and the trial court through each violation of the MRL that Miller and Pacific had alleged against his clients. As to each alleged violation and each defendant, he argued that the conduct in which Star and B&B had engaged

10

was permissible. And he concluded by stating that "there [was] no violation of the mobile home residency law" in this case.

But the jury and the trial court disagreed. The jury found that Star and B&B had engaged in all, or nearly all, of the prohibited acts described in part I.A., *ante*, of this opinion; the trial court ruled that those acts constituted no less than six (or, by Star's count, seven) distinct violations of the MRL; and the trial court further ruled that those acts also constituted violations of Business & Professions Code section 17200 et seq. (commonly known as the Unfair Competition Law or UCL),[4] which prohibits any business practice that is unfair or unlawful. (See Bus. & Prof. Code § 17200.)

Then the trial court quoted Business & Professions Code section 17203 and stated in its conclusion that an injunction should issue, as follows:

> "Business & Professions Code § 17203 provides, in pertinent part: 'Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The Court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any

---

[4] The jury expressed its findings of fact on the special verdict form, and the trial court expressed its ruling in a document entitled Ruling on Plaintiffs' Third Cause of Action for Alleged Violations of Business & Professions Code § 17200 et seq., dated May 11, 2022 (Ruling on Injunctive Relief). The Ruling on Injunctive Relief was not designated for inclusion in the Clerk's Transcript on this appeal. However, in the interests of justice and to assist us in resolving this appeal, we obtained a copy of the Ruling on Injunctive Relief from the superior court and, on our own motion, augment the record to include it. (See Cal. Rules of Court, rule 8.155(a)(1)(A); *State Comp. Ins. Fund v. WallDesign Inc.* (2011) 199 Cal.App.4th 1525, 1529, fn. 1 ["We have frequently used our discretionary authority under California Rules of Court, rule 8.155 to augment the appellate record with documents contained in the trial court record that were omitted by the parties, through mistake or neglect, in order to assist us in reviewing appeals on their merits."].)

11

practice which constitutes unfair competition, as defined in this chapter.

"In this case, the Court finds that it is appropriate to enter a permanent injunction against each of the two defendants, prohibiting each of them from doing any of the following: (1) during the term of any homeowner's rental agreement or during the 60 days following the giving of a 60 day notice, requiring the removal of the subject mobilehome based upon the sale of the mobilehome to a third party; (2) terminating the tenancy of any mobilehome park tenant for the purpose of making the tenant's space available for the sale of a mobilehome by the owner or the owner's agent; (3) within a period of less than 60 days of the time a three-day notice to pay rent is served, terminating or refusing to renew a tenancy by demanding that the subject mobilehome be sold or removed; (4) withholding approval of any prospective mobilehome park tenant for any reason other than (a) the prospective tenant's unwillingness or inability to comply with the park's rules and regulations, (b) the prospective tenant's financial inability to pay the rent, estimated utilities and other charges of the park, or (c) the prospective tenant's fraud, deceit or concealment of material facts; (5) within 15 days of receiving all information reasonably requested from a prospective homeowner, failing to notify the prospective homeowner that her application has been accepted or rejected; and (6) failing to set forth in any notice of termination of tenancy the reason relied upon for the termination, with specific facts showing the date, place, witnesses and circumstances concerning the reason for termination."

The trial court then issued a judgment in which it awarded damages to Miller and Pacific and imposed the injunction it had articulated in its ruling.

Star timely appealed.

## II.

## DISCUSSION

Although it insisted at trial that there had been no violation of the mobilehome residency law, Star now concedes on appeal that "what happened

12

with regard to space 35 in 2018 was . . . a violation of the MRL." In addition, Star acknowledges in its reply brief, not only that "the UCL provides injunctive relief for unlawful business practices," but that the scope of the UCL is broad inasmuch as, under the UCL, "a single act can constitute an unlawful business practice."[5]

Star assigns error, however, to the court's conclusion that the evidence at trial warranted imposition of an injunction. According to Star, that evidence was insufficient to support an inference that the violations of the MRL that had been proven at trial represented anything other than one-off-type deviations from the manner in which Star customarily transacts its business, and that these "aberrations" were neither ongoing at the time of trial nor likely to recur.

In examining this contention, we begin with the standard of review.

## A. *The Standard of Review*

In this state, it is well settled that "[t]he grant or denial of a permanent injunction rests within the trial court's sound discretion." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390.) It also is well settled that that discretion, when exercised in the context of considering equitable relief under the UCL, "is very broad." (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 180; accord *Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1277 (*Benson*) ["A trial court has 'very broad' discretion in formulating equitable relief in unfair

---

[5] The case law is in accord. (See, e.g., *UFW v. Dutra Farms* (2000) 83 Cal.App.4th 1146, 1163 [affirming injunction]; *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570; *Klein v. Earth Elements, Inc.* (1997) 59 Cal.App.4th 965, 969 fn. 3; *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [an unlawful business practice within the meaning of the UCL includes " 'anything that can properly be called a business practice and that at the same time is forbidden by law' "].)

13

competition law actions."].) Consequently, a permanent injunction "will not be disturbed on appeal absent a showing of a clear abuse of discretion." (*Horsford,* at p. 390.)

"A court abuses its discretion only when" the decision it makes is " ' " 'an arbitrary, capricious, or patently absurd determination.' " ' " (*In re Caden C.* (2021) 11 Cal.5th 614, 641 (*Caden C.*)). As a consequence, " ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court' " ' " (*ibid.*) and "should interfere only ' "if . . . under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did." ' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067 (*Robert L.*).) As can be seen, the abuse-of-discretion standard that we apply to our review of the injunction in this case is much like the substantial-evidence standard that we apply when a trial court's factual determinations are at issue. (Cf. *Caden C., supra,* 11 Cal.5th at p. 641 ["where . . . 'the appellate court will be evaluating the factual basis for an exercise of discretion, there likely will be no practical difference in application' " between the abuse-of-discretion and substantial-evidence standards of review (italics omitted)]; see also *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 ["[t]he practical differences between the two standards of review are not significant"].)

Thus the question with which we are confronted is: Was the record of violations on which the trial court decided to impose an injunction in this case so utterly lacking in indicia of a likely recurrence as to render the trial court's decision to issue an injunction "arbitrary, capricious, or patently absurd?"

14

### B. *The Sufficiency of the Evidence*

In answering the question just posed, we begin by noting that Star does not appear to be challenging the *substance* of the injunction. That is to say, Star is not parsing the scope or duration or phraseology of the injunction, nor is it arguing that any particular behavior that the injunction prohibits is behavior that should instead be permitted. Rather, it is challenging the notion that an injunction of *any* sort should have issued at all. And, as we have noted above, it is premising this challenge on an argument that there was not "sufficient evidence of an ongoing unlawful practice by Star at the time of judgment, or [of] the probability of a future violation," to warrant issuance of an injunction against it.

It is indeed "the general rule . . . that an injunction may not issue unless the alleged misconduct is ongoing or likely to recur" (*Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 464; see also *Davis v. Farmers Insurance Exchange* (2016) 245 Cal.App.4th 1302, 1326-1327); and it is equally the law that the UCL has not altered this rule. (*Madrid,* at pp. 464–465.) But for reasons we discuss below, we conclude that there *was* sufficient evidence to support an inference that violations of the sort in which Star had engaged were likely to recur and, therefore, that the decision of the trial court to issue the injunction cannot reasonably be said to have been "arbitrary, capricious, or patently absurd." (*Caden C., supra,* 11 Cal.5th at p. 641.)

First, of course, there was the evidence of how Star comported itself with regard to the transaction involving space 35. While one *could* interpret the MRL-violating business practices with which Star burdened Miller, Pacific, and Schultz as deviations from the Star norm, the test is not whether evidence can be interpreted in way that cuts *against* the judgment. Rather, as discussed above, our charge is to "interfere only ' "if . . . under all the

evidence, viewed most favorably *in support* of the trial court's action, no judge could reasonably have made the order that [the trial judge] did." ' " (*Robert L., supra,* 21 Cal.App.4th at p. 1067 (italics added).) And, indeed, there was ample evidence to support an inference that the pile-up of violations with respect to space 35 was not merely a fluke, but instead amounted to a sustained campaign of sharp practices intended to dispossess Schultz of space 35, so that Star and B&B, in lieu of Pacific, might profit on the sale of a new mobilehome.

Second, there was evidence from which it could be inferred that Star's violations were representative of a broader pattern and practice, if not a modus operandi, of treating mobilehome park tenants and prospective tenants (and competing mobilehome dealerships that served their needs) unfairly in direct contravention of the Legislature's expressly stated policy "that . . . it is necessary that the owners of mobilehomes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the [MRL]." (§ 798.55(a).) In this regard, when Giangreco was asked to reflect on the previous 50-100 residency applications that she had submitted to mobilehome parks, and to state whether she perceived "a difference between the way Star . . . and Lamplighter handled [residency] applications and the way other mobilehome[] [park managers] handled applications," she responded: "Yes." The difference, she said, was "vast." And she illustrated what she meant, in several ways.

Thus, for example, in reflecting on her experience in helping prospective tenants with their residency applications at mobilehome parks over the years, Giangreco testified that most park managers would respond promptly, some within 72 hours—but that, of the dozens of residency

16

applications she had submitted to Star-managed parks, she did not believe a single one had ever been accepted within the 15 days required by the MRL. Instead, she said, Star would routinely respond with "a standard letter" saying that the application was incomplete but without specifying what in Star's view was missing.

When asked specifically about her experience with Star at Lamplighter Park, Giangreco testified that "it [was] obvious . . . that Star . . . was making it difficult for other mobilehome dealers to come in" and transact business in the park. In illustration of this point, Giangreco described a transaction (involving a space other than space 35) that had resulted in a mobilehome dealer named Prestige Manufactured Homes (Prestige) deciding to decline any further business that involved putting new mobilehomes into Lamplighter Park. In that transaction, "nothing [that was the responsibility of Star] was done in a timely manner," it felt as though Star was "making [Giangreco] unnecessarily jump through hoops," and Star's conduct in "dragg[ing] out the process" ended up imposing costs on the mobilehome purchaser, the agent (Giangreco), and the dealer. As Giangreco explained matters, the practices in which Star had engaged, Prestige had been "very much at the . . . mercy" of Star and B&B, and the motivation behind its decision to exit the Lamplighter Park market was not simply that "it was such a pain," but that "it was too much of a risk."

Feeney testified similarly. Asked what his reaction had been when he learned of the position Star had taken in its August 21 letters, Feeney testified that he "wasn't surprised . . . Star would do that." Then he elaborated, with reference to Star, that: "It's never easy. It's just one thing after another, so it wasn't shocking that they'd try to pull that."

17

Stepping back from the events associated with space 35 and speaking more broadly to his experience with Star *generally* during the preceding 20-25 years, Feeney stated that the experience of "trying to put a new mobilehome into [a] park" managed by Star was "unlike all the other communities we do business in" because Star made it "very, very, very, very, very difficult" in a way that was "not normal." "It's . . . laborious, almost impossible, . . . they just add rules after rules after rules, and it just seems like a big roadblock from start to finish, . . . unlike all the other communities." Although Feeney did not explicitly state that the MRL-defying practices in which Star had engaged with respect to space 35 were examples of what he was referring to in these statements, that that was his meaning could reasonably be inferred.

The trial court heard this testimony, it heard the testimony of Star's principal (Mike Cirillo) and two Star employees, and it heard the testimony of several other witnesses who had had direct dealings with Star. It occupied a front-row seat, from which it had an opportunity—one not afforded to an appellate court (see, e.g., *Camarena v. State Personnel Board* (1997) 54 Cal.App.4th 698, 703)—to observe the witnesses' demeanor and to assess their credibility. And, on the basis of what it heard, it concluded that an injunction was warranted.

Although the trial court's ruling did not include a discussion regarding the probability that Star's conduct would recur (instead it merely stated that an injunction was warranted), we cannot say on the record before us that it would be "arbitrary, capricious, or patently absurd" to conclude that the plaintiffs had established a likelihood of recurrence. (Cf. *Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443 ["[E]ven if there is no indication of the trial court's rationale . . . , the court's decision will be upheld

18

on appeal if reasonable justification for it can be found. 'We uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion." ' "].) The body of evidence here was enough.

In an effort to persuade us otherwise, Star argues the evidence was too limited in scope, too "anecdotal," and too stale. But, as we discuss below, these arguments do not propel Star over the high hurdle it must clear to prove an abuse of the trial court's discretion.

Star's argument that the evidence was too limited in scope is premised on the fact that the offending conduct that received the most detailed attention at trial related to just one single mobilehome pad in just one single mobilehome community: space 35 in Lamplighter Park.[6] Its argument that the evidence was too "anecdotal" turns on its contention that Giangreco and Feeney's accounts of their dealings with Star *apart from space 35* were insufficiently particularized to warrant imposition of injunctive relief. But, for each of several reasons, these arguments are of limited force. First, the evidence regarding the practices whereby Star illegally parted Schultz from space 35 and thwarted the sale of the mobilehome to Miller was exceedingly

---

[6]     There is a tension between this argument and what Star argued at trial. At trial, Star objected to questioning about practices in which Star had engaged *other* than with respect to space 35 and *other* than at Lamplighter Park. In support of this objection, Star argued that testimony to the effect that "Star does this all the time" had been "covered ad nauseum," that "questioning associated with other spaces and other homeowners and their predicaments . . . [was] completely irrelevant," and that testimony about "experiences Ms. Giangreco [had had] with other residents and tenants" of Star-managed properties was too prejudicial." In other words, whereas Star argues now that the plaintiffs did not adduce *enough* evidence of its conduct, the argument it made *before* was that the volume of such evidence was too *much*.

19

particularized. Second, as Star has acknowledged (see *ante*), the case law makes clear that *one* violation alone may constitute an unlawful business practice warranting imposition of an injunction under the UCL. Yet, by *Star's* count in this case, "[t]he jury determined [that] Star and B&B [had] engaged in *seven* violations"—obviously, much more than is required by the UCL. Third, bearing in mind that the grant of equitable power to courts in UCL matters is "broad" (*Benson, supra,* 152 Cal.App.4th at p. 1277), and that the discretion accorded to the trial courts in such matters is " 'very broad' " (*ibid.*), we do not see fit to shackle such authority by, in effect, requiring that a UCL plaintiff investigate, conduct discovery, and present evidence regarding the behavior of a UCL defendant in all (or most or even more than one) of the locales in which the defendant operates before the issuance of company-wide equitable relief may be considered. Indeed, to impose such a restriction would be especially inapt in a case, such as this, in which the defendants' unfair, illegal, public-policy-defying business practices originated at, and were driven by, the uppermost levels of management.

As for Star's argument that the evidence was too stale, it is premised on the notion that, by the time this case went to trial and resulted in a judgment in 2022, too much water had passed under the proverbial bridge. Specifically: (1) "Star . . . ha[d] been terminated by B&B in 2020," so it "was no longer in a position to engage in unfair practices in Lamplighter Park;" (2) Giangreco had left the mobilehome sales industry toward the end of 2018, so she had no current knowledge about the business practices of Star; and (3) the demise of the Miller-Schultz-Pacific transaction (earlier in 2018) dated back even further than that.

But this argument defies logic, and it disregards Star's stance at trial. The argument defies logic inasmuch as the unfair and illegal practices of Star

20

on which most of the evidence in this case focused were traceable, not to some rogue employee in Lamplighter Park, but rather to the corporate suite and the company's topmost officer: its president and sole shareholder, Mike Cirillo. Thus it is reasonable to presume that the practices in which Star engaged with tenants, prospective tenants, and Star-unaffiliated mobilehome dealerships at Lamplighter Park are indicative of practices in which it engages with such persons at *other* mobilehome parks that it manages. Hence we see no reason why the fact that B&B terminated Star's services at the mobilehome parks *it* owns should counsel against issuance of an injunction applicable to mobilehome parks that *others* own.

The staleness argument disregards Star's stance at trial in that, at all times during the trial, Star strenuously maintained that the practices in which it had engaged did not violate the MRL. Thus, however true it may be that the offending conduct to which Giangreco and many of the other witnesses testified was four years old at the time of trial, Star's insistence on the *permissibility* of that conduct was right up to the minute at the time of trial, thus rendering those witnesses' evidence not stale at all. (See *People v. Overstock.com, Inc.* (2017) 12 Cal.App.5th 1064, 1092 [affirming injunction, even though defendant had "discontinued [offending] practice . . . several years before trial," because the fact that the defendant "continued [through trial] to take the position that the use of formulas was proper" demonstrated risk of recurrence]; *Robinson v. U-Haul Co. of California* (2016) 4 Cal.App.5th 304, 315 ["there is no hard-and-fast rule that a party's discontinuance of illegal behavior makes injunctive relief . . . unavailable"]; *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 133 [similar]; *Marin County Board of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920, 929 [" 'It is settled that [even] the voluntary discontinuance of alleged illegal practices does not

21

remove the pending charges of illegality from the sphere of judicial power or relieve the court of the duty of determining the validity of such charges where by the mere volition of a party the challenged practices may be resumed;' " reversing judgment to extent it denied injunctive relief].)

### C. *Attorney's Fees*

Miller and Pacific request an award of attorney's fees on appeal. The request finds support in Civil Code section 798.85, which provides: "in any action arising out of the provisions of [the MRL], the prevailing party shall be entitled to reasonable attorney's fees and costs." The request also finds support in *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, in which the court of appeal held that "[a] statute authorizing an attorney fee award at the trial court level includes appellate attorney fees unless the statute specifically provides otherwise." (*Id.,* at p. 1499 [court of appeal awarded fees on appeal]; accord *Roe v. Halbig* (2018) 29 Cal. App.5th 286, 313; cf. Cal. Rules of Court, rule 8.278(d)(2) [court of appeal may order that attorney's fees be included in an award of costs].) Star opposes the request on the grounds that "[a] reversal by this Court of the injunction could result in a change of the prevailing party status by the trial court or a determination of no prevailing party." But we are affirming, not reversing. Hence we conclude an award of attorney's fees to Miller and Pacific is warranted.

## DISPOSITION

The judgment is affirmed. Miller and Pacific shall recover their costs and attorney's fees on appeal, in an amount to be determined by the trial court.

KELETY, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.